David Rosenbaum, 009819
Joseph Roth, 025725
OSBORN MALEDON, P.A.
2929 N. Central Ave, Suite 2000
Phoenix, AZ 85012
Telephone:    (602) 640-9000
drosenbaum@omlaw.com
jroth@omlaw.com

Beau W. Buffier, *pro hac vice* forthcoming
WILSON SONSINI GOODRICH & ROSATI, P.C.
201 Washington Street, Suite 2000
Boston, MA 02108
Telephone: (617) 598-7800
bbuffier@wsgr.com

Eric P. Tuttle, *pro hac vice* forthcoming
WILSON SONSINI GOODRICH & ROSATI, P.C.
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Telephone:    (206) 883-2500
eric.tuttle@wsgr.com

*Attorneys for Plaintiffs Zillow Group, Inc.
 and ShowingTime.com, LLC*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Zillow Group, Inc. and ShowingTime.com, LLC,<br><br>             Plaintiffs,<br><br>      v.<br><br>Arizona Regional Multiple Listing Service, Inc., Multiple Listing Service, Inc., and MLS Aligned, LLC,<br><br>             Defendants. | CASE NO. _____<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

KE 95720267.17

1.     Zillow   Group,   Inc.   ("Zillow")   and   ShowingTime.com,   LLC ("ShowingTime")   (collectively   "Plaintiffs")   bring   this   action   against   Arizona   Regional Multiple   Listing   Service,   Inc.   ("ARMLS"),   Multiple   Listing   Service,   Inc.   d/b/a   Metro Multiple   Listing   Service,   Inc.   ("Metro MLS,"   and   together   with   ARMLS,   the   "MLS Defendants")   and   MLS Aligned, LLC   ("MLS Aligned,"   and   collectively   with   the   MLS Defendants, "Defendants") under federal antitrust laws and allege as follows:

## I.     NATURE OF THE ACTION

2.     Plaintiffs   bring   this   lawsuit   to   stop   Defendants   from   unlawfully   attempting to monopolize  the market  for real estate showing management services in the geographic regions   they   control   and   from   unlawfully   conspiring   to   exclude   or   severely   limit ShowingTime, their competitor in those markets.

3.     ShowingTime   provides   software   and   services   that   help   real   estate professionals[1]   automate and streamline   the process  of  making appointments  to show or tour   a property   that   is   for   sale   (a   "showing   management   platform").   ShowingTime's platform also benefits consumers (home buyers and sellers), who are able to buy and sell real estate more efficiently.   In 2021, ShowingTime was acquired by Zillow, a company that   has   modernized   the   traditional   model   for   home   sales,   including   by   making   more information directly available to consumers.

4.     The MLS Defendants are regional multiple listing services ("MLSs").   Within their   respective   regions,   the   MLS Defendants   have   a   monopoly   on   essential   real   estate services:   the collection, aggregation, and distribution of for-sale property listings ("MLS Services").   Defendants have conspired to extend this regional monopoly on MLS Services into a regional monopoly on showing management platforms.

5.     To successfully   compete   in a given region, agents must have access to these MLS Services and so must become members of their regional MLS.   In each region, the relevant MLS Defendant controls the MLS database of available homes listed for sale.   It

---

[1] For simplicity,  "agents" herein refers to real estate agents and licensed brokers.

also controls the MLS member portal, which is the means by which agents access the MLS database and other MLS Services.

6.      The MLS member portal is the tool that agents in the region use to list a home for sale in the MLS database, search for homes listed for sale in the MLS database, and analyze market trends.   The MLS member portal facilitates the flow of information between buyer and listing agents, including communications to coordinate property showings and tours.  MLSs also make ancillary services available to members through the member portal, such as showing management services that help coordinate times for buyers, appraisers, and inspectors to visit a property.  By controlling the member portals that agents use to access the essential MLS Services, the MLS Defendants control how listing agents can list a home and what ancillary services are integrated into the member portal and made convenient and effective for agents to use.

7.       For many years, ShowingTime's showing management platform has been offered by the MLS Defendants as a service for MLS members in their coverage regions and integrated into their member portals. When using the MLS member portal to list a home, the listing agent may opt to use ShowingTime's base calendaring software product, which allows listing agents to embed a link for buyer agents to conveniently and automatically schedule an appointment to tour that home directly from the listing.  Some agents also subscribe to ShowingTime's premium add-on services, including virtual front desk services and access to a call center for live scheduling support. These premium add-on services depend upon the base calendaring software that is integrated with the MLS member portal to provide a more seamless and efficient scheduling experience.

8.      In 2021, the MLS Defendants and several other MLSs joined forces to create an entity named MLS Aligned.  MLS Aligned acquired another showing management platform, which Defendants further developed and re-branded as Aligned Showings.

9.      The MLS Defendants initially launched Aligned Showings as an option for their members alongside the ShowingTime product.  Defendants conspired to use various

tactics to steer their members to Aligned Showings, including by making Aligned Showings the default showing service, positioning Aligned Showings as a means of moving away from a competing product (ShowingTime) affiliated with Zillow (which some MLSs and agents view as a threat to their traditional business model), falsely disparaging ShowingTime in their instructional videos and materials, and warning agents that ShowingTime would eventually be taken away. But because Aligned Showings is an inferior product, agents mostly declined to switch.

10. Rather than competing on the merits by improving their product and allowing listing agents the freedom to continue to choose between ShowingTime or Aligned Showings, on information and belief, Defendants conspired to create a monopoly in their regions for their own showing management platform.[2] They did so through anticompetitive and exclusionary conduct, including by conspiring to cut off the integration of ShowingTime into their MLS member portals. In coordinated fashion, the Defendants and other MLS members of MLS Aligned began to remove integration for the ShowingTime platform from their member portals (or announce that removal of such integration was imminent). For example, Defendants announced that integration for ShowingTime's platform would be removed from ARMLS's member portal in December 2023 and from Metro MLS's member portal in February 2024.

11. These actions left Aligned Showings as the only practical choice available to most agents on these MLS member portals. The availability of ShowingTime as an integrated scheduling option on the MLS member portal is critical to ShowingTime's efficiency and functionality, as agents primarily access ShowingTime through the MLS member portal. If ShowingTime is not available as an integrated option on the MLS member portal for listing agents to select when listing a home, most listing agents will choose another option that is integrated (even if it is otherwise inferior) and will not choose

---

[2] All allegations concerning Defendants' internal discussions and decision-making, the existence and scope of the conspiracy, and the coordination of actions through the conspiracy are made on information and belief, supported by publicly available facts (including facts alleged herein).

ShowingTime. By making Aligned Showings the only integrated option on the MLS member portal, the MLS Defendants are substantially foreclosing ShowingTime from their markets and giving Aligned Showings a monopoly over showing management platforms in their respective regions.

12.     If Defendants are allowed to continue with their anticompetitive scheme, ShowingTime will be substantially foreclosed from these regional markets, and home buyers, sellers, and their agents in that region will suffer. If Defendants succeed, there will be no competition to spur improvements to their product or to prevent Defendants from raising prices for their product, particularly for any premium add-ons such as concierge and call-center services. In addition, because ShowingTime's services can be made more directly available to consumers through consumer-oriented platforms like Zillow and Redfin by substantially foreclosing ShowingTime from these markets, Defendants are harming consumers, consumer-oriented platforms, and agents that work with consumer-oriented platforms.

13.     Because each MLS Defendant exclusively controls the means by which real estate professionals in their respective regions place and access aggregated for-sale listings through their operation of the MLS member portal, Defendants' concerted efforts to exclude competitors is an attempt to leverage their monopoly over MLS Services into a monopoly for scheduling services in their coverage areas.

14.     Through this action, Plaintiffs seek to restore a level playing field and to be given a fair opportunity to compete on the merits with Defendants' showing management platform. Such competition will not only benefit Plaintiffs but will also benefit agents and consumers by giving them more choice, lower prices, and more innovation.

## II.     PARTIES

### A.     Plaintiffs

15.     Plaintiff Zillow Group, Inc. is a corporation existing under the laws of the State of Washington, with its principal place of business at 1301 Second Avenue, FL 36,

Seattle, Washington 98101. Among other things, Zillow operates a portfolio of real estate websites including Zillow.com, Trulia.com, and StreetEasy.com, each of which provide consumers and others with direct access to real estate information and related services, allows agents to advertise on their websites, and facilitates all aspects of home buying and selling. Zillow has modernized and improved the traditional experience of consumers looking to buy or sell their homes. Zillow is also the (indirect) parent company of Plaintiff ShowingTime.com, LLC.

16.    Plaintiff ShowingTime.com, LLC is a Limited Liability Company with offices at 227 W. Monroe, Suite 2100, Chicago, Illinois 60606. ShowingTime offers showing management services and software for the real estate industry.

**B.    Defendants**

17.    Defendant Arizona Regional Multiple Listing Service, Inc. is an Arizona corporation with offices at 130 S. Priest Drive, Suite 101, Tempe, Arizona 85281-259. ARMLS operates the MLS member portal and listings database for agents in the Phoenix, Scottsdale, and surrounding area, covering over 42,000 real estate professionals.[3]

18.    Defendant Multiple Listing Service, Inc. d/b/a Metro Multiple Listing Service, Inc. is a Wisconsin domestic business with offices at 12300 W Center St, Milwaukee, Wisconsin 53222. Metro MLS operates the member portal and database for agents in the greater Milwaukee metropolitan area and other nearby areas, covering over 9,000 real estate professionals.[4]

19.    MLS Aligned, LLC is a Delaware limited liability corporation with offices at 130 South Priest Drive, Suite 101, Tempe, Arizona 85281-259. MLS Aligned is owned by six member MLS organizations including ARMLS and Metro MLS. MLS Aligned provides a showing management platform under the product name Aligned Showings.

---

[3] Who is AMRLS?, ARMLS, https://armls.com/who-are-armls-subscribers-2 (last visited December 22, 2023).

[4] About Metro MLS, Metro MLS, https://metromls.com/about-metro-mls/ (last visited December 22, 2023); Metro MLS Coverage Map, Metro MLS, https://metromls.com/wp-content/uploads/2021/08/Metro-MLS-Coverage-Map.pdf (last visited December 22, 2023).

### III.   JURISDICTION AND VENUE

20.    Plaintiffs bring this action seeking injunctive relief, damages, treble damages, cost of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1–2.

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337(a) (commerce and antitrust regulation).  Plaintiffs have standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

22.    This Court has personal jurisdiction over the Defendants and venue is proper in the District of Arizona and this division under 15 U.S.C. § 22 and 28 U.S.C. § 1391.  All Defendants reside in this district, including because all Defendants are subject to personal jurisdiction in this district with respect to these claims.  MLS Aligned and ARMLS have their principal places of business in Arizona and regularly transact business within the District of Arizona.  Defendants formulated and joined a conspiracy with its center of gravity in in this district and that expressly aims its anticompetitive conduct at this district, both in seeking to monopolize the market for showing management services in the geographic area served by ARMLS and in seeking monopoly power in other regions through the use of an Arizona-based showing management platform.  Defendants knew and specifically intended that their conspiracy would be implemented in this district, would exclude competition in this district, and would harm consumers in this district.  Moreover, through its membership in and participation in the management of MLS Aligned, LLC, which has a principal place of business in this district, Metro MLS is engaged in relevant activities in the District of Arizona.  Finally, a substantial part of the events or omissions giving rise to Plaintiffs' antitrust claims occurred in the District of Arizona and this division.

23.     Defendants are engaged in, and their activities substantially affect, interstate trade and commerce.  Billions of dollars flow across state lines in the real estate market, including in transactions by the MLS Defendants and their members.

## IV.     FACTUAL ALLEGATIONS

### A.     Multiple Listing Services Monopolize an Essential Service for Real Estate Transactions in a Given Geography

24.     The real estate industry depends on multiple listing services ("MLSs") to provide a multitude of services to their members, but the primary function of an MLS is to collect, aggregate, and distribute the single most important information for real estate transactions: for-sale[5] listings data on the available homes in a particular geography.  MLS listings databases are "so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS."[6]  Hence, in 2022, 86% of all sellers listed their homes on an MLS.[7]

25.     The vast majority of MLSs in the United States are affiliates of the National Association of Realtors ("NAR"), the largest trade association in the real estate industry.  NAR rules require NAR-affiliated MLSs to establish a board of directors responsible for approving and enforcing the MLS's rules and regulations.  An MLS may also be advised by a separate executive committee, which provides the MLS's staff and board of directors with additional guidance and assistance in the governance of the MLS.

---

[5] While MLSs may also compile, maintain, and distribute rental listings, the prevalence of rental listings listed with an MLS varies from geography to geography because rental listings are not subject to the same marketing rules and policies as for-sale listings.  While the anticompetitive effects of Defendants' conduct in this case are applicable to both for-sale listings and rental listings, we limit our discussion to for-sale listings throughout this Complaint.

[6] U.S. Fed. Trade Comm'n and U.S. Dep't of Just., Competition in the Real Estate Brokerage Industry 12 (2007), https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf.

[7] Relator Magazine, How to Explain Local MLS Broker Marketplaces to Clients, National Association of Relators, https://www.nar.realtor/magazine/real-estate-news/sales-marketing/how-to-explain-local-mls-broker-marketplaces-to-clients (last visited December 22, 2023).

26.     All agents must be members of the MLS that operates in their geographic region in order to successfully conduct business.  Agents working on behalf of a home seller (the "listing agent") create listings through the MLS member portal operated by the MLS in which they are a member.  The MLS then aggregates all of the listings entered by their members into a database that can be accessed by all MLS members.

27.     An MLS listing for a home contains essential data about the home, such as number of bedrooms and bathrooms, square footage, parking options, listing price, days on the market, property taxes, photos of the home, and the name of the listing agent.  Listing agents can input hundreds of data fields into the MLS database for any given listing.

28.     NAR rules require agents in NAR-affiliated MLSs to list their clients' homes on the MLS listings database within one business day of marketing the home to the public.  The rationale for this rule is simple:  Home sellers benefit through increased exposure for their homes, and home buyers benefit because they can obtain information about all available homes without having to go to multiple brokerages to inquire about each brokerage's agents' listings one by one.  All parties to a potential real estate transaction, including the agents who represent the buyer and seller, are made better off by the MLS's aggregation, maintenance, and distribution of all available for-sale listings to all MLS members.

29.     In addition to the critical listings database, the MLS member portal also gives its members access to other ancillary services provided by the MLS as member benefits.  For example, many MLSs contract with third-party vendors to provide services to their members such as market analytics tools, digital forms for transaction management, property records information, and showing management platforms.  These ancillary services benefit from being "put in front" of members on the MLS's member portal and through integration with the MLS database and member portal, and agents, buyers, and sellers benefit from getting convenient access to these services.  MLSs also provide training and technical support for their suite of ancillary services.

30.    As all members must access their member portal to transact business, distribution through the MLS member portal is the most efficient channel for third-party vendors to reach agents in a geography.  If a third-party vendor is unable to distribute its products or services through the MLS, it would need to go brokerage by brokerage, or in some cases agent by agent, to promote, sell, and train agents on its products and services.

**B.     Showing Management Platforms Provide Significant Benefits to Agents**

31.    Buyer tours (or "showings") are a key part of the homebuying process. Showings allow buyers to assess interest in the property and perform later activities necessary for a sale, such as mortgage appraisals and home inspections.

32.    Each appointment generally requires coordination among a buyer's agent, potential buyer, listing agent, and owner or occupier of the property.  Traditionally, listing agents had to exchange multiple rounds of phone calls, text messages, emails, or voicemails with buyer agents and the property owner to get a single showing appointment scheduled. An agent must balance these ongoing exchanges, likely for multiple properties across their buyers and sellers, while also attending the showings, meeting with clients, and conducting a myriad of daily on-the-go responsibilities .

33.    Showing management platforms simplify and streamline communications between the parties to facilitate scheduling appointments, providing significant efficiency gains for agents and homeowners.  ShowingTime is one such showing management platform.  Many other companies provide showing management services, including BrokerBay, SentriKey Showing Service, Showingly, Calendly, Lone Wolf Technologies, and Aligned Showings (owned and operated by Defendants).

34.    Since ShowingTime launched in 1999, the Company's primary goal has been simple: make it easier for real estate professionals to connect with each other and their clients.  ShowingTime's innovative technology coordinates scheduling behind the scenes so agents can seamlessly book a confirmed home showing, simplifying a traditionally

1  complicated and cumbersome process.  ShowingTime products are used in hundreds of

2  MLSs across the country.

3        35.      ShowingTime    offers   a   base   calendaring   software   product   called

4  ShowingTime for the MLS that integrates with MLS member portals.  ShowingTime for

5  the MLS offers both listing agents and buyer agents a seamless user experience for

6  scheduling showings.  For MLSs that integrate ShowingTime for the MLS, listing agents

7  creating a new listing in the MLS member portal can select ShowingTime as the preferred

8  method for scheduling tours, which generates a "Schedule a Showing" smart link on the

9  listing (see Figure 1).

10                                      **Figure 1**



25        36.      When a buyer agent clicks the "Schedule a Showing" smart link, she is asked

26  if this is the first time using ShowingTime Next Generation.  The buyer agent will be asked

27  to sign in to her ShowingTime account (or create one if she does not already have one) to

28

confirm the information that will populate her agent profile. The buyer agent will only be prompted to complete this step one time during her initial access into ShowingTime Next Generation and will have her information automatically added to future requests to schedule a showing. She is then presented with the appointment booking screen with the information on the listing that she was viewing on the MLS database prepopulated alongside a view of any other confirmed showing appointments she has made (see Figure 2).

**Figure 2**



37.   Once the buyer agent selects a date and time for the showing, she need only click "Submit Request." If a home is set to auto-confirm showing requests, the buyer

agent's calendar will update to show the confirmed appointment in green and provide the necessary showing instructions for the agent to access the property (see Figure 3). Additionally, an automated text message, phone call, mobile app alert, or email (depending on the buyer agent's system preferences) will be pushed to the buyer agent and, if the buyer agent chose to enter the buyer's contact information, to the buyer through the Home by ShowingTime mobile application indicating the confirmed date and time.

**Figure 3**



38.    For homes that are not set to auto-confirm showing requests, after the buyer agent clicks "Submit Request" the buyer agent's calendar will update to show the requested appointment in yellow (see Figure 4).

**Figure 4**



39.    ShowingTime simultaneously pushes a notification to the listing agent for that property (and potentially also the property owner or occupant) informing them of the appointment request and prompting them to either confirm the requested appointment time or contact the buyer agent to finalize the scheduling.  Listing agents and owners/occupants can confirm the request through several convenient means, in which case the buyer agent (and potentially also the buyer) are automatically notified.

40.     Another feature afforded to ShowingTime users is the ability of buyer agents to prepare multi-stop showing itineraries for home buyers through ShowingCart.[8]  Buyer agents can plan a full day of tours by simply selecting listings from the MLS, adding them to the ShowingCart, and arranging the listings in whatever order they would like.  Once a buyer agent has added all of the listings she wishes to schedule for a particular buyer, she can submit all of the scheduling appointments with only one click.  ShowingCart also prepares a map showing the routes between listings based on the chosen order of showings and even helps buyer agents formulate a plan for which route to take when driving between listings.  Additionally, ShowingTime provides SmartRoute which will auto-arrange listings to suggest the shortest travel time route between tour stops.  This tool increases the efficiency of the scheduling process for buyer agents and home buyers in instances where a buyer is interested in viewing multiple properties in one day (which is a fairly common practice).

41.     The functionality afforded through ShowingTime for the MLS saves agents countless hours that might otherwise be spent manually scheduling tours and allows their clients, the home buyers, to view more properties in less time.  ShowingTime has invested substantial time and money into developing innovative products that agents can easily adopt and utilize to streamline their work, and is continuing to innovate and deploy new features.[9]

42.     ShowingTime also offers two premium upgrades to ShowingTime for the MLS.  First, ShowingTime Front Desk helps brokerages efficiently manage their offices

---

[8] ShowingCart Means Easy Appointment Scheduling, ShowingTime, https://www.showingtime.com/blog/showingcart-means-easy-appointment-scheduling/ (last visited December 22, 2023).
[9] For example, ShowingTime has developed and is releasing a next generation experience and user interface. See, e.g., The Latest on the Next Generation of ShowingTime, ShowingTime, https://showingtimeplus.com/resources/blog/next-gen-update (last visited December 22, 2023); ShowingTime's Next Generation User Experience FAQs, ShowingTime, https://www.showingtime.com/blog/showingtimes-next-generation-user-experience-faqs/ (last visited December 22, 2023); Next Generation ShowingTime Features to Get Excited About, ShowingTime, https://www.showingtime.com/blog/next-generation-showingtime-experience-features-to-get-excited-about/ (last visited December 22, 2023).

by simplifying administrative workflows related to scheduling showings. The system provides scheduling management, activity reports, lead management, and automated feedback requests.

43.    Second, ShowingTime Appointment Center is an around-the-clock service center with live specialists to streamline showing and offer management for agents. Appointment Center builds on ShowingTime for MLS, relying on it for listings and availability data.

44.    ShowingTime also supports the ability of Zillow and other platforms like Redfin to deliver "real-time" availability to consumers seeking to tour a home displayed on Zillow's website or mobile application.[10]   Buyers seeking to schedule a tour through Zillow's website or mobile application, for example, are able to quickly and conveniently access a home, within minutes or hours, which could otherwise take days.

45.    Quickly facilitating tours for these "high-intent" home shoppers also benefits Zillow's Premier Agent partners because the conversion rate from potential buyer to actual transaction is meaningfully higher for home shoppers requesting tours than it is for an average consumer. For listings where ShowingTime is the showing management platform, Zillow Premier Agent partners (who are members of the MLS and have access to ShowingTime) are often able to confirm showing appointments for their clients within minutes, providing greater convenience to the buyer and a better lead to the Zillow Premier Agent partner.

46.    ShowingTime can also integrate with other showing management platforms to automate cross-platform appointment requests and confirmations when there is more than one showing management platform available on a given MLS member portal. ShowingTime supports integrations with other showing management platforms because access to more listings benefits users of both showing management platforms. Agents using ShowingTime can include properties on the other showing management platform in

---

[10] The websites and mobile apps for Zillow and Redfin attract tens of millions of visitors per month.

designing multi-stop tours, send appointment requests for all properties at once, and receive confirmations from the other platform all while still in the ShowingTime interface.

**C.      MLSs Play a Critical Role in the Provision of Showing Management Services**

47.      MLSs control two critical components of the real estate industry: (i) access to listings data, and (ii) access to integration with the MLS member portal.  The first is an essential input needed for many digital real estate products, including showing management platforms; the second is the most efficient—and often, as a practical matter, the only acceptable—means of distribution for many ancillary software services used by agents, including showing management platforms.

48.      MLSs typically contract with showing management platforms for systemwide distribution on the MLS member portal.  MLSs can, and do, contract with multiple vendors for such integrations.  MLSs will play competing vendors against each other for access to this critical distribution channel in an attempt to secure the best possible services at the lowest possible price for members.  The MLS recoups the cost of these third-party services through the dues paid by members.

49.      MLSs also license listings data and membership data (e.g., agent names, email addresses, phone numbers, etc.) to vendors for use in these products, including those that are not integrated into the MLS member portals.  Tools like showing management platforms require access to the MLS listings data to function effectively.

50.      ShowingTime, in particular, relies on both the MLS listings data and integration with the MLS member portal to provide a seamless user experience for listing agents, buyer agents, and homeowners as described above.  This smart link is the primary way that buyer agents book tours with ShowingTime.  Over the past year, more than 80 percent of all tours scheduled on ShowingTime's platform for the ARMLS region were made by clicking on the ShowingTime "Schedule a Tour" button on the MLS member portal.

51.    If ShowingTime is not integrated with the MLS member portal, the user experience is severely impacted for both listing and buyer agents. Listing agents are not able to save their preferred default showing management settings and simply "check the box" to select ShowingTime as the showing management platform for a new listing, and buyer agents are no longer presented with the "Schedule a Showing" smart link that allows them to confirm showing appointments within minutes.

52.    Listing agents wishing to use ShowingTime as their showing management platform for listings on an MLS that does not integrate ShowingTime are subjected to a far more manual process. First, the listing agent must manually type showing instructions into a field on the MLS listing, instructing buyer agents to use a non-clickable URL or call a phone number to schedule a tour. After entering that information, the listing agent must then navigate to the ShowingTime platform (either through a new web page or the ShowingTime mobile application), log in, search for the listing they created, and enable showing scheduling from there.

53.    For those listings created on MLSs that do not integrate ShowingTime, buyer agents are not presented the ShowingTime "Schedule a Showing" smart link when they view the listing in the MLS member portal. Depending on the instructions manually entered by the listing agent, buyer agents will be forced to either: (1) open a new browser window, copy and paste the URL from the showing instructions on the listing, log in to their ShowingTime account, and search for the listing they were viewing in the MLS before they ever get to the web page they could have gotten to with one click of the "Schedule a Showing" smart link, or (2) try to reach the listing agent by calling the phone number provided in the showing instructions on the listing.

54.    As a result, arranging a showing is more time-consuming for both listing and buyer agents, and everyone loses out on the benefits that ShowingTime's automation is intended to provide. In a hot real estate market, hours and even minutes of delay can mean

the difference between winning and losing a client, the best offer, or the house of one's dreams.

55.    The practical effect of a showing management platform not being integrated into the MLS member portal is that the platform is functionally unworkable for most agents.    The manual processes involved in setting up a listing in ShowingTime and scheduling appointments when the "Schedule a Showing" smart link cannot be selected render the transaction costs of using ShowingTime—a service intended to simplify an agent's workflow—too high, particularly when a different showing management platform *is* integrated with the MLS member portal.

### D.    Defendants' Attempt to Preclude ShowingTime from Competing

56.    In 2021, several MLSs, including the MLS Defendants, came together to form MLS Aligned and acquire the technology of Agent Inbox, a messaging and showing platform that had shut down in 2017.

57.    MLS Aligned, is a "collective" managed and controlled by the various MLSs who formed it, including the MLS Defendants.    The Board of Managers of MLS Aligned is composed of the CEO of each member MLS, including the CEOs of both MLS Defendants.

58.    In a press release announcing the acquisition of Agent Inbox, MLS Aligned explained: "After seeing significant changes in real estate software and the various company acquisitions over the last year, the need to standardize and modernize this data on their own showing platforms became evident." Given this "need," "MLS Aligned is committed to being the leading force for standardizing showing data for the industry."[11]

59.    Further, "MLS Aligned will control and further innovate on the most critical workflows of the real estate transaction."    MLS Defendants and MLS Aligned recognized that they are "stronger together than apart."[12]

---

[11] ARMLS + MLS Aligned Acquires Agent Inbox, ARMLS, https://armls.com/armls-mls-aligned-acquires-agent-inbox  (last visited December 22, 2023).
[12] *Id.*

60.    ShowingTime has contracted with the MLS Aligned member MLSs to provide showing services to their agents for decades.  The contractual terms vary across each of the MLSs, but in each case ShowingTime has been integrated into the MLS member portal for all MLS Aligned members.

61.    In January 2023, MLS Aligned re-launched the Agent Inbox technology under a new name: Aligned Showings.  The MLS Defendants publicly identify Aligned Showings as a product owned by them.[13]  The first MLS Aligned member to launch Aligned Showings did so on January 30, 2023.

62.    Since September 2023, other MLS Aligned members have launched Aligned Showings, including MLS Defendants.  MLS Defendants have since stated that they will no longer integrate ShowingTime into their MLS member portals and will instead exclusively integrate Aligned Showings, and they have taken interim steps to severely disadvantage ShowingTime by degrading the user experience significantly even before removing ShowingTime's integration with their member platforms.

63.    ARMLS was the first of the MLS Defendants to take public action.  It launched Aligned Showings on or about September 26, 2023.[14]  On that date, Aligned Showings became the default showing management platform for agents creating listings on the MLS portal.  ARMLS immediately began telling its agents that Aligned Showings would eventually become the only option, and that ShowingTime would eventually be going away.

64.    Notwithstanding that ARMLS made Aligned Showings the default option, most agents continued using ShowingTime because it is a superior product, and the inferior Aligned Showings did not gain traction.  Accordingly, ARMLS took further steps.

---

[13] Aligned Showings, ARMLS, https://armls.com/aligned-showings (FAQ, "Aligned Showings, owned by ARMLS and other MLSs . . . .") (last visited December 21, 2023); Aligned Showings, Metro MLS, https://metromls.com/aligned-showings/ (FAQs, "Aligned Showings, owned by Metro MLS and other MLSs . . . .") (last visited December 22, 2023).
[14] ARMLS Launches Aligned Showings to 40,000 Subscribers, ACCESSWIRE, https://www.accesswire.com/783261/armls-launches-aligned-showings-to-40000-subscribers (last visited December 22, 2023).

65.     On October 2, 2023, ARMLS provided notice to ShowingTime that it would be terminating its existing contract effective December 30, 2023, removing integration into the ARMLS member portal and access to ARMLS listing data. ARMLS indicated that it would no longer supply listings data to ShowingTime at all.[15]

66.     On or about November 13, 2023, ARMLS announced to its members that ShowingTime would be removed from its member portal on December 27, 2023. On or about December 12, 2023, ARMLS stopped allowing agents to use ShowingTime for any new listings. While the ShowingTime "Schedule a Showing" smart link is still operational on listings where a listing agent selected to use ShowingTime as the showing service prior to December 12, 2023, as of December 27, 2023, that link will disappear and ARMLS will entirely remove ShowingTime integration. ARMLS added a "countdown" clock to its website continually announcing to agents that ShowingTime integration will soon be completely eliminated (see Figure 5).

---

[15] Without access to this listings data, ShowingTime is not able to operate in the ARMLS market at all. ARMLS suggested that ShowingTime approach the brokerages operating in ARMLS's market individually to discuss obtaining listings data directly from them. Negotiating individual contracts with each of the tens of thousands of brokerages and agents operating in ARMLS's market would be cost prohibitive. After strong pushback, ARMLS has agreed to provide ShowingTime with a different data license enabling ShowingTime to continue to receive a feed of all ARMLS listings data. While the new data license solves the existential threat to ShowingTime's ability to operate in ARMLS's market at all, it does not remedy the severe competitive harm that will be suffered by ShowingTime, Zillow, agents, and consumers stemming from ARMLS's other decisions, which it has not reversed.

**Figure 5: Screenshot of ARMLS's Website as of 12/22/2013**



67.    ARMLS will instead use Aligned Showings as the exclusive showing management platform for its members going forward.

68.    Metro MLS launched Aligned Showings on December 5, 2023.[16]  Although Metro MLS members can still access integrated ShowingTime links on older listings, since December 5, listing agents no longer have the option to select ShowingTime as an integrated showing management service for new listings.  Metro MLS plans to completely remove the ShowingTime integration in February 2024.[17]

---

[16] Aligned Showings Now Available for Members, Metro MLS, https://metromls.com/aligned-showings-now-available-for-members/  (last visited December 22, 2023).
[17] Keller Williams Prestige - Germantown, MLS Aligned Showings w/ Jared Jamrozy, Youtube, https://www.youtube.com/watch?v=a-jfKzAR5Qs (beginning at 56:27; and beginning at 1:03:37) (last visited December 22, 2023).

69.     The implications of Metro MLS's removal of ShowingTime integration from its member portal are similar to those described above for ARMLS. The user experience for listing and buyer agents in each of these markets will be similarly degraded, such that ShowingTime will no longer be an effective competitor when the integration is cut off.

**E.     A Conspiracy to Monopolize the Showing Management Platform Markets**

70.     The MLS Defendants have collectively agreed to boycott ShowingTime and other similar showing management platforms and instead funnel all showing management business conducted through each of their respective MLS member portals to their preferred vendor, Aligned Showings, which they jointly manage, and in which they have a financial interest.

71.     MLS Aligned, which owns the Aligned Showings technology, is a collaborative entity managed jointly by six member MLSs, including ARMLS and Metro MLS. The CEOs of those MLSs, including the CEOs of each of the MLS Defendants, each serve as a member of the Board of Managers of MLS Aligned. Further evidencing the close working relationship between the MLS Defendants and MLS Aligned, employees of the MLS Defendants also work on projects on behalf of MLS Aligned under arrangements by which the MLS Defendants loan out their employees to MLS Aligned, for example to train agents on how to use Aligned Showings. The MLS Defendants' interest and activities in MLS Aligned provide them the motive and opportunity to collude in connection with MLS Aligned.[18]

72.     Despite complaints received by agents, the MLS Defendants (and other MLS members of MLS Aligned) have taken actions since late 2023 to make Aligned Showings the default option in each of their respective MLS member portals and to further remove ShowingTime's integration. For example, Opendoor Brokerage (one of the top ten largest

---

[18] ARMLS and Metro MLS also collaborate through another noncontiguous joint venture. About Metro MLS, Metro MLS, https://metromls.com/about-metro-mls/ (last visited December 22, 2023).

brokerages in ARMLS's region) has contacted ARMLS to express their concern with the decision to remove ShowingTime integration from ARMLS's MLS member portal as ShowingTime is their "chosen showing service."

73.     ShowingTime approached each of the MLS Defendants and offered to maintain the ShowingTime base calendaring software for free to members of those MLSs, and to integrate ShowingTime with Aligned Showings so that the two platforms can communicate, so long as the MLS member portals continued integration with ShowingTime (alongside Aligned Showings).  ARMLS and Metro MLS had previously been paying a monthly service fee to give its members access to ShowingTime's core scheduling product.  Each of the MLS Defendants declined to continue receiving ShowingTime services at no cost to themselves or their members, notwithstanding their own members' stated preference for ShowingTime.  There is no rational economic reason to reject the provision of valuable services at no cost, except for the existence of a conspiracy.  Through their conspiracy and conduct in furtherance of that conspiracy, Defendants are forcing members in each MLS region to use their inferior showing management platform rather than having to compete fairly with ShowingTime on the merits.

## V.     RELEVANT MARKETS

### A.     Relevant Product Markets

#### 1.     Showing Management Platforms

74.     One relevant product market for analyzing Defendants' exclusionary conduct is showing management platforms.  Showing management platforms assist real estate agents in requesting, confirming, and managing appointments for visiting for-sale properties.

75.     Showing management platforms may offer premium features beyond calendaring, such as lead management, activity reporting, market reports, call centers, or lockbox integrations.

76.     A showing management platform replaces the laborious traditional way of arranging showings and other real estate appointments like home inspections, significantly reducing workloads for agents and office staff.   Before the innovations of showing management platforms, buyers' agents and staff had to call listing agents to request an appointment time.   Given that agents are often out of the office, visiting properties and meeting with clients, it can be difficult for both parties to connect by phone, and to coordinate with their respective clients by phone.   Showing management platforms allow automated and asynchronous communications between agents, solving the hassles of the "classic" tour scheduling process.

77.     Given the significant increase in workload and reduction in productivity that would result, customers would not switch back to the classic tour scheduling process when faced with a small but significant price increase for a showing management platform.

78.     Scheduling software that is not built for the real estate industry also is not a reasonable substitute for showing management platforms as it is not designed to accommodate the complexities of property listings and interactions between buyers' agents, sellers' agents, and property owners.   For example, ShowingTime generates videoconference links for virtual showings, optimizes scheduling, provides directions to properties, and allows agent-to-agent messaging.

79.     Customers would not switch to non-specialized scheduling software in response to a small but significant price increase for a showing management platform because of the significantly limited functionality.

80.     The market for showing management platforms is a relevant product market in which to analyze the effects of Defendants' anticompetitive scheme.   ShowingTime participates in this market as a seller.

## 2.     MLS Services

81.     A second relevant product market for analyzing Defendants' exclusionary conduct is MLS Services (*i.e.*, the collection, aggregation, and distribution of for-sale

property listings).  The MLS Defendants monopolize the markets for MLS Services in their respective regions.  And the MLS member portals, which the MLS Defendants control in their regions, are the overwhelming means by which agents in those regions access both MLS Services and showing management platforms.

82.  Almost all agents join their local MLS to have access to current listings and a way to easily communicate with other agents.

83.  Most MLSs are affiliated with NAR and must follow its rules and bylaws. NAR rules require agents to list their homes on the MLS listings database within one business day of marketing the home to the public.  MLS listings are available to all members.

84.  MLS Services are "marketplace" services characterized by network effects, where the value of the service is a function of the number of agents that use the service.[19] Much like a securities exchange, they efficiently bring together buyers and sellers.  The NAR listing requirement reinforces the network effects of the MLS:  MLS members are required to list their homes with the MLS, and so the MLS marketplace grows in size.  With more properties available, more agents want access to the aggregated listings to find properties for their buyers, and so join the MLS.  These agents are then required to also post their new listings on the MLS.

85.  Buyers' agents need access to MLS Services, including the MLS database, for the best and most efficient opportunity to find properties for their clients.  Listing agents likewise need access to MLS Services, including the opportunity to post in the MLS database, to reach the largest network of agents working in their area.  The MLS member portal is the means to access MLS Services, connecting buyers and sellers in a market to interact efficiently and thereby facilitate real estate transactions.  MLS Services are simply

---

[19] Relator Magazine, How to Explain Local MLS Broker Marketplaces to Clients, National Association of Relators, https://www.nar.realtor/magazine/real-estate-news/sales-marketing/how-to-explain-local-mls-broker-marketplaces-to-clients (last visited December 22, 2023).

a must-have for agents, and accordingly almost all agents are members of an MLS and use the MLS member portal to access MLS Services.

86.     The MLS member portals provide agents with access not only to MLS Services, but also to additional (ancillary) integrated services that assist members in their daily tasks. For example, MLSs may integrate software for showing management, offer management, tax record searches, and digital forms and contracts. The MLS may provide them for free as a benefit of membership.

87.     Integration into the MLS member portal is key for the functionality of many of these related services. For example, when ShowingTime is integrated into the MLS member portal, an MLS listing can include an embedded link to ShowingTime's services that automatically takes the user to a screen showing availability and the ability to schedule an appointment without having to make a call, open a new browser window, log in to a separate service, and separately look up a listing. Without integration into the MLS member portal, ShowingTime cannot effectively compete for showing management services against another platform that is integrated.

88.     The MLS provides training and technical support for integrated services, which further encourages agents to use the services integrated with the MLS member portal rather than competing, non-integrated services.

89.     There is no reasonable substitute for MLS Services and the MLS member portals that provide access to these services. First, the MLS listings data could not reasonably be recreated from individual brokers and kept up-to-date in real-time. The distribution channel provided from integration into the MLS member portal likewise could not be recreated. Second, independent distribution cannot reasonably substitute for integration into the MLS member portal, which puts the product "front and center" to agents. Substituting for outside products instead of those integrated into the member portal introduces the inefficiencies the member portal is designed to alleviate. Because agents must use the MLS member portal to accomplish core components of their jobs, agents

simply will not go to a separate site to accomplish tasks they could do within the MLS member portal as this adds time and complexity. Even if they prefer a competing product, the cost of switching is too great to convince them to do so.

90. Each MLS has a monopoly over MLS Services, and controls the MLS member portal used to access those services, in its coverage area.

91. The market for MLS Services is a relevant product market because the MLS Defendants are leveraging their monopoly in that market to also monopolize the market for showing management platforms.

**B.    Relevant Geographic Markets**

92. The relevant geographic market for showing management platforms and MLS Services is the geographic area covered by the associated MLS.

93. Here, the relevant geographic markets are the geographic areas covered by the MLS Defendants: ARMLS's coverage area encompasses a significant portion of Arizona, with most MLS listings found in Maricopa and Pinal Counties,[20] and Metro MLS's coverage area encompasses the greater Milwaukee metro area and other nearby counties.[21]

94. An MLS's listings data mostly contain properties in the geographic coverage area served by the MLS. Home buyers are typically interested in a particular area, and agents use their knowledge of a certain geographic area as a marketing point to attract buyer and seller clients. Agents are also licensed only in a particular area and accordingly scheduling home tours, as buyers' or sellers' agents, in that area.

95. Agents in Phoenix cannot instead use Metro MLS's member portal and showing management platform to schedule a tour of a Phoenix property. The MLS member portal by design serves its MLS coverage area, and an agent cannot switch to a different

---

[20] Who is ARMLS?, ARMLS, https://armls.com/who-are-armls-subscribers-2 (last visited December 22, 2023).
[21] Metro MLS Coverage Areas, Metro MLS, https://metromls.com/wp-content/uploads/2021/08/Metro-MLS-Coverage-Map.pdf (last visited December 22, 2023).

MLS's member portal to access the same listings database and other tools available on their home portal.

96.     Although showing management vendors compete for agents as customers for premium products, they do so within the MLSs for which they have access to listing data. Similarly, where multiple showing management platforms serve a single MLS, the showing management platforms compete for individual agents to use the baseline product, but again only within that MLS.

## VI.     ANTICOMPETITIVE CONDUCT

97.     Rather than compete on the merits of their product, Aligned Showings, Defendants are conspiring to exclude competitors and force MLS Defendants' members to use their inferior product. After joining forces to acquire Agent Inbox in 2021, MLS Defendants are now taking steps to collect on their investment by degrading access to ShowingTime's offering, steering agents to Aligned Showings, and making Aligned Showings the only feasible scheduling tool in their coverage area. The motivations for these actions are anticompetitive, including the MLS Defendants' own financial benefit, through their ownership and control of MLS Aligned, at the expense of their members and consumers.

98.     An MLS's position as controlling MLS Services—with source-of-truth real estate listings data for their coverage area and the most efficient distribution mechanism to reach agents—gives MLSs power to steer their members towards or away from technologies or providers. MLS Defendants are doing exactly that here to make their own product, Aligned Showings, the only deeply integrated showings software available to their members.

99.     MLS Aligned announced its intent to "standardiz[e] showing data for the industry" in the face of "significant changes in real estate software."[22] That is, in the face of innovation from non-traditional, tech-focused competitors like Zillow, the parent

---

[22] ARMLS + MLS Aligned Acquires Agent Inbox, ARMLS, https://armls.com/armls-mls-aligned-acquires-agent-inbox (last visited December 22, 2023).

company of ShowingTime, the MLS Defendants aspire to impose a self-serving standard on the industry.

100.   MLS Defendants are first focused on their home markets, where ShowingTime has been an available and preferred showing management platform. MLS Aligned has so far launched Aligned Showings in its member MLSs, meaning it has not won any competitive match-ups.[23]   MLS Aligned claims to have "more MLSs on the roadmap," evidencing its intent to monopolize software management services in additional regions.[24]

101.   MLS Defendants are highly likely to succeed in their monopolization efforts given their complete control over each respective MLS member portal.  Providers of showing management services like ShowingTime must be integrated into the MLS member portal to have access to complete, accurate, and timely aggregated listings data to make the product function and to make the product a viable choice for agents to use.

i. *ARMLS's Anticompetitive Conduct*

102.   ARMLS's removal of the ShowingTime integration will immediately and severely impact the ShowingTime user experience for both listing and buyer agents, leaving agents who wish to continue using ShowingTime with a manual, clunky, and time-consuming process.

103.   Listing agents are no longer able to select ShowingTime as their preferred showing service when creating a new listing in the MLS database.  Instead, those who wish to continue using ShowingTime have to manually type in showing instructions into the MLS listing directing buyer agents to use a non-clickable URL or call a phone number to schedule a tour.  The listing agent will then have to separately log into ShowingTime to manually link the new listing to ShowingTime.  While older listings are currently able to integrate with ShowingTime, that integration will end on December 27, 2023.  As a result,

---

[23] Greg Robertson Joins MLS Aligned as Executive Advisor, NEWSWIRE, https://www.newswire.com/news/greg-robertson-joins-mls-aligned-as-executive-advisor-22171222 (November 13, 2023).
[24] *Id.*

listing agents who continue to use ShowingTime will have to field more phone calls from buyer agents seeking to schedule a tour for any of their listings rather than benefit from ShowingTime's automation.

104.   Buyer agents are no longer presented a ShowingTime "Schedule a Showing" smart link for new (and, after December 27, 2023, any) listings that utilize ShowingTime as the showing service provider.   On MLS portals that integrate ShowingTime, the "Schedule a Showing" smart link directs buyer agents to a web page that automatically logs the agent into his or her ShowingTime profile and shows the tour scheduling availability for the listing they were viewing in the MLS.   Without the integration, buyer agents will be forced to either: (1) open a new browser, copy and paste the URL from the showing instructions on the listing, log in to their ShowingTime account, and search for the listing they were viewing in the MLS before they ever get to the web page that populates with one click of the "Schedule a Showing" smart link, or (2) try to reach the listing agent by calling the phone number provided in the showing instructions on the listing.

105.   By removing the ShowingTime integration entirely from the MLS portal, ARMLS is effectively precluding ShowingTime from competing in the ARMLS market. The user experience for both listing and buyer agents will be so severely degraded without the integration that agents will generally be forced to turn to Aligned Showings, even if they would rather use ShowingTime.   Indeed, ShowingTime customers in the ARMLS market, including one of the top ten largest brokerages in Phoenix, have contacted both ShowingTime and ARMLS to express their displeasure with ARMLS's decision and their anxiety over being steered away from a product they prefer to a new product that they may not like.   For example, on December 19, 2023 Opendoor Brokerage emailed the CEO of ARMLS to express concerns about ARMLS implementing changes to "our chosen showing service" and "the link for ShowingTime disappearing."

106.   ARMLS could choose to offer its members the ability to use both ShowingTime and Aligned Showings.   Indeed, ARMLS has done so in the past, and

ShowingTime has offered to continue providing its product to ARMLS *free of charge* and to integrate ShowingTime and Aligned Showings in order to avoid being cut out of the market entirely. But rather than offering its members a choice between showing services and competing with ShowingTime on the merits, ARMLS has chosen to leverage its monopoly power over MLS Services to cripple ShowingTime and prop up Aligned Showings, an MLS Aligned product in which ARMLS has a financial interest.

107.   ARMLS has made its motive quite clear. After launching Aligned Showings, ARMLS included the following FAQ and response on its website:[25]

> − What is the reason for transitioning to Aligned Showings?
>
> Aligned Showings, owned by ARMLS and other MLSs, offers a contemporary showing experience shaped by our valued subscribers. Additionally, the change in ownership of ShowingTime, acquired by a competing brokerage, poses a conflict of interest for us and our subscribers.

ARMLS subsequently updated the response to this FAQ to instead state: "In December 2023, the contract with ARMLS and ShowingTime as a subscriber benefit will come to an end. Aligned Showings, owned by ARMLS and other MLSs, offers a contemporary showing experience shaped by our valued subscribers."[26]

108.   In a training to ARMLS agents on September 26, 2023 an ARMLS staff person (acting on behalf of MLS Aligned), Ms. Smith, began the training by explaining why MLS Aligned created Aligned Showings:

> "Aligned Showings is a product that we created in house. It is created and owned by ARMLS and MLS Aligned. It's just a group of MLSs in the country that pool together for these resources, like creating a showing platform. Now I don't think it's really any secret as far as to who owns ShowingTime. Now they are a competing brokerage and that didn't really

---

[25] *See* archived version of <u>Aligned Showings</u>, ARMLS, https://armls.com/aligned-showings from October 20, 2023 at https://web.archive.org/web/20231020213620/https://armls.com/aligned-showings (last visited December 22, 2023).

[26] <u>Aligned Showings</u>, ARMLS, https://armls.com/aligned-showings (last visited December 22, 2023).

sit well with us to kind of give them an unfair advantage and use a product that one of our brokerages uses, so we created this product an even playing field [sic]."[27]

109.    Although ARMLS had not yet informed ShowingTime of its intention to remove ShowingTime's integration with the ARMLS portal, Ms. Smith's remarks during this training indicate that ARMLS's plan from the very beginning was to steer agents completely away from ShowingTime by crippling the user experience for ShowingTime's products:

> "We don't have any kind of date as far as when ShowingTime might be going away. We do expect [Aligned Showings] to replace ShowingTime down the line, but we just don't have an exact date on that at the moment. So for the time being, there is going to be a little bit of juggling, some balancing on using those two different showing service, but we are really depending on listing agents to adopt this service so that everyone can get on board with that new showing service sooner rather than later, and it will be less of a struggle for everyone else balancing the two."[28]

110.    The ARMLS training also makes clear that ARMLS was aware that they were degrading the user experience for buyer agents seeking to schedule tours for their clients.

111.    The combination of ARMLS's degradation of ShowingTime's product and its steering campaign to force agents to adopt Aligned Showings amount to a premeditated scheme to substantially foreclose ShowingTime from competing at all in ARMLS's market. In response to a question about when ARMLS expects the majority of agents to switch over to Aligned Showings, Ms. Smith said:

> "This is very highly dependent on listing agents adopting it. However, new listings going forward are defaulted to Aligned Showings. . . . A week ago we had just test listings in here, and now we have 940 listings. So you'll see that as time kind of goes on and new listings come on the market with this new showing service, there's going to be more and more Aligned Showings and less and less of ShowingTime."[29]

112.    ARMLS's attempt to curtail competition in favor of self-enrichment is anticompetitive; its conduct has and will continue to harm competition unless it is enjoined.

---

[27] My Home Group, <u>My ARMLS Training - Aligned Showings</u>, Youtube, https://www.youtube.com/watch?v=Hmc50ySrhQI (beginning at 0:40) (last visited December 22, 2023).
[28] *Id.* (beginning at 1:32).
[29] *Id.* (beginning at 41:30).

ii. _Metro MLS's Anticompetitive Conduct_

113.    Metro MLS is in lock step with ARMLS, both in the decision to remove ShowingTime's integration with its member portal and with the messaging to its members. The user experience for listing agents and buyer agents in Metro MLS's market has been similarly degraded and will worsen when the integration is completely removed in February, such that ShowingTime will no longer be an effective competitor to Aligned Showings.

114.    Metro MLS has also made abundantly clear its motive for excluding ShowingTime.  In a training to Keller Williams agents in Germantown, Wisconsin on December 5, 2023 conducted by Mr. Jamrozy, Metro MLS's Director of Member Engagement, Mr. Jamrozy responded to a question from an agent about whether ShowingTime will still be available through Metro MLS's portal since other MLSs in the area will still be using ShowingTime:

> "Sometime in February is when [ShowingTime] will be going away. . . . We will not be facilitating any contact with ShowingTime, period, after that drop dead date that we have.  So if you do have to set up a showing in those other areas, you will have to contact the agent."[30]

The agent responded sarcastically: "That will create a lot of love for us."

115.    Mr. Jamrozy mentions several times during the training that Metro MLS is encouraging other nearby MLSs, including South Central Wisconsin Multiple Listing Service, to adopt Aligned Showings and "cut ties" with ShowingTime.  In responding to further questions from agents about scheduling showings for listings that are in neighboring towns or counties and are listed through other MLSs where ShowingTime is still being utilized, Mr. Jamrozy said:

> "There are, like, in our areas like Jefferson and Dodge where there's a lot of carry over in between, I feel bad for those agents right now.  They are going to have more issues with it than we will, but hopefully we can get everyone else to adopt this change.  The biggest incentive for them to do it is (a) it's

---

[30] Keller Williams Prestige - Germantown, MLS Aligned Showings w/ Jared Jamrozy, Youtube, https://www.youtube.com/watch?v=a-jfKzAR5Qs (beginning at beginning at 1:03:37) (last visited December 22, 2023).

not owned by one of their competitors, which they have an agreement that, you know, what they can and cannot do with the data that they get. They've already broken that several times over. So it's MLS owned and it's costing about half of what ShowingTime is charging."[31]

116.     While it is true that nearby agents (as well as agents within Metro MLS) are going to experience difficulties due to Metro MLS's decision to remove ShowingTime's integration, several of his other statements are false. ShowingTime has not breached any agreements with Metro MLS (or any of the neighboring MLSs in Wisconsin) related to data use policies. Further, ShowingTime has offered to continue providing its product to Metro MLS *for free* in exchange for remaining integrated with Metro MLS.

117.     Metro MLS has taken other steps to further mislead its members about ShowingTime. For example, when Metro MLS added FAQs to its website about the decision to discontinue ShowingTime's services in favor of Aligned Showings, it falsely claimed that its "current policy does not allow [Metro MLS] to purchase products owned or managed by another MLS participant, and the ownership change with ShowingTime requires this decision." But Metro MLS has no such policy, and ShowingTime has been owned by Zillow for over two years. Mike Lane, Vice President of Enterprise Sales and Industry Relations for ShowingTime, contacted Metro MLS CEO Chris Carrillo about these false statements, but Mr. Carrillo did not respond to his email.

118.     Finally, Metro MLS touts on its website that Aligned Showings is a "modern, intuitive platform" that will allow "Metro MLS to shape and improve the system to meet the needs of our local market."[32] This is pretextual: Metro MLS has shown a disregard for bringing "modern, intuitive platforms" to its members because it has explicitly prohibited ShowingTime from introducing new features to Metro MLS's members. For example, on September 21, 2022, a Zillow employee contacted Metro MLS CEO Chris Carrillo to inform Mr. Carrillo that ShowingTime was planning to introduce the "real-time" availability functionality to Metro MLS's members – at no additional charge – beginning

---

[31] *Id.* (beginning at 1:08:01).
[32] Aligned Showings, Metro MLS, https://metromls.com/aligned-showings/ (last visited December 22, 2023).

in October 2022.  This functionality would have improved the scheduling experience for buyer and listing agents as well as home buyers and sellers, and would have helped buyer agents generate higher quality leads.  Mr. Carrillo immediately responded that "Metro MLS does not wish to enable *any new or updated ShowingTime features* going forward."  Over a year later, in December 2023, Metro MLS finally enabled ShowingTime to provide the real-time availability functionality in its region.  But this functionality will again disappear when Metro MLS removes ShowingTime's integration in February.  And Metro MLS has continued to block ShowingTime from deploying ShowingTime's next generation interface in that region.

119.  Just like ARMLS, when confronted about its anticompetitive conduct, Metro MLS changed the wording on its FAQ to remove the false statements.  Today, Metro MLS's response to the same FAQ is: "Aligned Showings, owned by Metro MLS and other MLSs, is a modern, intuitive platform that allows Metro MLS to shape and improve the system to meet the needs of our local market."[33]

120.  Metro MLS's anticompetitive scheme to severely handicap ShowingTime, implemented in conjunction with ARMLS and potentially other co-conspirators, has and will continue to harm competition unless it is enjoined.

iv.  *Defendants Have Engaged in a Conspiracy*

121.  Defendants, and potentially other MLS co-conspirators, are engaged in a conspiracy to restrain trade and monopolize the market for showing management platforms.

122.  The MLS Defendants have used the "collective" vehicle they manage and control, MLS Aligned, to effectuate their conspiracy.  Through MLS Aligned, Defendants created the opportunity to communicate regularly and in fact they have met frequently in Phoenix and have had many calls to discuss their general collaboration.  The CEOs of the MLS Defendants and the other MLS members of MLS Aligned directly run MLS Aligned,

---

[33] *Id.*

and, on information and belief, they do not observe corporate separation or other formalities.

123.    Defendants coordinated on the launch of Aligned Showings and the removal of integration for ShowingTime, formulating common talking points and messaging to members and releasing the product at coordinated times.    Through MLS Aligned, Defendants have coordinated not just on technology projects, but have used MLS Aligned as their vehicle to also coordinate on business strategy.  Specifically, the MLS Defendants and MLS Aligned have agreed to funnel all showing management business conducted through each of their respective MLS member portals to their preferred vendor, Aligned Showings, in which they have a financial interest through their ownership of MLS Aligned, and to substantially foreclose ShowingTime from competing effectively.  This agreement between Defendants will in fact substantially foreclose ShowingTime and other competitors of Aligned Showings from competing on the merits of their showing management platforms.

124.    The MLS Defendants' decisions to continue with their scheme to degrade and exclude ShowingTime, rather than keeping the service available for their members for free, is explained rationally only as a result of concerted action to harm competition.

125.    MLS Aligned also provides a mechanism for Defendants to allocate collusive gains among themselves.

## VII.    ANTICOMPETITIVE EFFECTS

126.    Once MLS Defendants remove the ShowingTime integration from their member portals, most agents will be forced to use Aligned Showings.  The cost and inconvenience of using a non-integrated product will be insurmountable to many agents, no matter how much they might prefer to use ShowingTime over Aligned Showings. Moreover, once agents are forced to switch to Aligned Showings, the cost to switch back to ShowingTime, no matter how preferred ShowingTime's product is and how reluctant they were to switch to Aligned Showings in the first place, will be insurmountable for many

agents. These costs, combined with the network effects favoring the platform most used, will allow the inferior product Aligned Showings to take and maintain its hold on the market.

127.    MLS Defendants' conspiracy with MLS Aligned, in addition to their and individual efforts to each monopolize their individual geographic markets, harms agents, home buyers, sellers, and other industry participants.

### A.    Harm to Agents

128.    MLS Defendants are steering agents to an inferior showing management platform and introducing unnecessary frictions in setting up the appointments necessary to complete a home sale.

129.    Agents generally will use showing software easily accessible to them, meaning the option integrated with the MLS member portal, over one that is not. As noted above, a showing management platform that is not integrated with the MLS member portal has much less utility for agents.

130.    MLSs and brokerages purchase ShowingTime products, or competing showing management platforms, to increase their agents' efficiency and productivity, allowing them to better serve buyers and sellers. Real estate is a fast-moving industry and agents are busy. Adding significant friction to the use of a tool that is supposed to enhance productivity will cause agents to abandon it. Agents will instead use the inferior scheduling software integrated in their MLS member portal and included in their membership fees.

131.    Defendants' scheme has cascading negative effects for agents. Removing integration will significantly degrade the ability to use ShowingTime and its utility. Most agents will not have a choice but will have to use Aligned Showings, an inferior and untested product. Without competition, MLS Aligned has little incentive to invest further in Aligned Showings, although it has less functionality than competitors like ShowingTime.

132.    Agents and their staff will spend additional time scheduling appointments for both their buyer and seller clients. The additional burden will result in delays in scheduling appointments and possibly fewer appointments overall.

133.    With the scheduling delays, buyers will not be able to see properties of interest as quickly and could miss opportunities on fast-moving properties. Sellers will not be able to get people in to see the property as quickly and houses could sit on the market longer. Agents will be harmed in their ability to serve clients and convert leads for new clients.

**B.    Harm to Home Buyers and Sellers**

134.    The harm from Defendants' conduct will also extend to home buyers and sellers, who greatly benefit from the streamlined showing management services provided by ShowingTime.

135.    Home buyers value the near-instant confirmation of tour requests submitted through online consumer-oriented listings portals like Zillow and Redfin. ShowingTime has spent substantial time and money developing API integrations with online listings portals that automate the tour scheduling process for home buyers. ShowingTime's innovations have made it so that a home buyer searching for listings on Zillow or Redfin no longer needs to spend significant amounts of time on the phone with multiple agents in order to set up home tours.

136.    Those automations, however, function only when ShowingTime is integrated with the MLS member portal, which allows ShowingTime to facilitate instant communication between the buyer agent and listing agent. Without that integration, home buyers hoping to schedule a tour on short notice are unable to see in real-time the availability of the homes they are interested in touring, and are forced to wait until the buyer agent they were connected to through Zillow or Redfin is able to get in touch with the listing agent manually and confirm the requested tour time.

137.   The   friction   introduced   into   the   tour   scheduling   process   when ShowingTime's   integration   is   removed   negatively   impacts   home   buyers   because   it elongates the time between when buyers request the tour and when they are ultimately able to view the property.   In some markets, such a delay may mean that the buyer misses out on the property altogether because by the time his or her agent is able to get in touch with the listing agent to confirm an appointment time, the property is already under contract.

138.   Harm also occurs to home sellers, who desire for their house to be sold quickly and for a competitive price.   When a buyer is interested in touring a home but is unable to do so because the buyer agent is not able to instantly confirm the buyer's requested tour time, the seller may miss an opportunity for a competing offer from that buyer.

139.   There are meaningful benefits that flow directly to home buyers and sellers from the seamless user experience ShowingTime offers when it is integrated with the MLS member  portal,  and  they  will  be  made  worse  off  by  MLS  Defendants'  schemes  to substantially foreclose ShowingTime from operating in their geographies.

### C.   Harm to Other Industry Participants

140.   Defendants' conduct will also harm online listings portals such as Zillow and Redfin.

141.   When Zillow's touring functionality for consumers is degraded, that makes Zillow less useful and attractive overall to consumers, harming Zillow's goodwill.

142.   Moreover,  Zillow's  lead  generation  business  depends  upon  its  ability  to connect high-intent  home  buyers  with  buyer  agents  to  represent  them  in  a  real  estate transaction.   Home buyers in the MLS Defendants' regions benefit from Zillow's ability to display the real-time availability of showing appointments for listings where ShowingTime has  been  selected  by  the  listing  agent  as  the  showing  management  platform.   Because ShowingTime  is  currently  integrated  with  the  MLS  Defendants'  member  portals, ShowingTime is able to facilitate a one-click booking experience for home buyers.

143.    Home buyers who request to schedule a tour through Zillow are more likely to ultimately transact, making them high-value leads to Zillow's Premier Agent partners—especially when those partners are able to immediately respond to those requests and confirm a tour appointment within minutes.  ShowingTime has developed integrations with Zillow's Premier Agent application that make confirming a home buyer's tour request near instantaneous.

144.    When MLS Defendants remove the ShowingTime integration from their member portals, Zillow will no longer be able to offer this real-time touring experience in their regions.  As a direct result, Zillow's Premier Agent partners' first interaction with those high-intent home buyers seeking to schedule a tour will not be as smooth and may be delayed, reducing the chance that the buyer will decide to continue working with the Premier Agent partner.  As a consequence, these leads are less valuable to Premier Agent partners and to Zillow, resulting in less revenue to both.

145.    Redfin also integrates ShowingTime in order to provide home buyers a similarly near-instant tour scheduling experience.  Once MLS Defendants remove the ShowingTime integration, the user experience for Redfin agents and home buyers seeking to schedule a tour through Redfin will be similarly disrupted, which is likely to harm Redfin and consumers who use Redfin.

### D.    No Procompetitive Benefits

146.    MLS Defendants' conduct is self-serving and will result in Defendants' enrichment at the expense of agents, home buyers and sellers, and other industry participants.

147.    Like other technology platforms, showing management platforms are characterized by network effects.  As more agents choose to use a showing management platform, its value to other agents increases because more appointments can be booked from one program.  The ability to see all listings also increases the value of multi-stop-tour tools to design an efficient route for a group of properties and schedule them accordingly.

148.   Increased usage of Aligned Showings will have a positive network effect to build further usage—as more users make their listings available, additional customers are encouraged to join.  That network effect, however, is not the result of competition on the merits.   MLS Defendants are forcing agents to switch their existing listings from ShowingTime to Aligned Showings, and are leaving most agents no meaningful way to continue using ShowingTime moving forward.  As MLS Defendants steer agents to Aligned Showings while simultaneously degrading the user experience for members who would prefer to use ShowingTime, their power over showing management services will grow quickly.  So will MLS Align's revenues, which will be funneled back to MLS Defendants.

149.   MLS Defendants will further benefit from sales of upgrade products to agents forced to use Aligned Showings as the integrated feature in the MLS member portal.  Metro MLS is currently offering MLS Aligned's Concierge Service with discounted introductory pricing.  ARMLS is currently offering an MLS Aligned product similar to ShowingTime's Front Desk for free, but will later charge for this premium service, a monetization model used by other showing management platforms, once agents are locked in to using Aligned Showings.

150.   Aligned Showings will not agree to integrate on the backend with ShowingTime, which would allow ShowingTime to display listings supported by Aligned Showings and communicate with Aligned Showings to submit an appointment request made by a ShowingTime user.  Agents using Aligned Showings accordingly cannot use, as a practical matter, ShowingTime's or another competitor's premium products and instead will have to direct their business—and fees—to MLS Aligned.

151.   There is no procompetitive justification for Defendants' exclusionary conduct. Many agents prefer ShowingTime.  Some large brokerages have built their own infrastructure on top of ShowingTime.

152.   MLS Defendants could adopt the less restrictive alternative of offering agents a choice of showing management platforms.  Other MLSs offer a choice of showing management tools within the MLS portal, and MLS Defendants themselves have supported both ShowingTime and Aligned Showings in the past.  ShowingTime has offered to integrate its platform with Aligned Showings, so that both can coexist conveniently for agents within the MLS portal.

## VIII.   ANTITRUST INJURY TO SHOWINGTIME AND ZILLOW

153.   The anticompetitive scheme as alleged herein will cause harm to Plaintiffs of the type the antitrust laws were intended to prevent.  ShowingTime is harmed as a direct result of the MLS Defendants' group boycott and attempts to exclude competition from other showing management services in their respective geographic areas.  If Defendants' conduct proceeds, ShowingTime will be substantially foreclosed from effectively competing for customers in the geographic markets and selling its premium services.  This kind of stifling of competition is the type of injury the antitrust laws are intended to prevent.

154.   Zillow will also suffer antitrust injury.  Zillow is directly harmed by MLS Defendants' exclusionary conduct.  ShowingTime powers a popular feature on Zillow's website, allowing a prospective home buyer to see real-time availability to schedule a showing in as little as 1 to 2 minutes.  In geographic markets where ShowingTime is integrated with the local MLS and where Zillow has enabled real-time touring (including the regions served by MLS Defendants), a Zillow user can see a live calendar, book an appointment for an available spot in an automated fashion, and be paired quickly with a Zillow Premier Agent partner who is a licensed member of the MLS.  When MLS Defendants degrade ShowingTime's functionality, Zillow will no longer be able to provide "real time" showing scheduling to prospective home buyers.  Instead, the user would request an appointment (without being able to see availability), which would then go to a Zillow Premier Agent, who then has to manually contact the listing agent about availability and schedule the showing, introducing significant delay (potentially hours or days) and

potential loss of interest. This hurts prospective home buyers, buyer agents, and Zillow, which loses the ability to provide a valuable service to buyers and agents. It also hurts sellers and listing agents, who may be missing out on offers.

## IX.   CLAIMS
### Count I:  Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (as to all Defendants)

155.   Plaintiffs repeat and incorporate each and every allegation set forth in the preceding paragraphs of this Complaint.

156.   Upon information and belief, Defendants engaged in a group boycott of ShowingTime to unreasonably restrain trade in the markets for showing management platforms and to hamper ShowingTime's ability to compete with MLS Aligned's competing product. Defendants' conspiracy threatens to exclude ShowingTime, and other competitors who may attempt to enter, from the geographic markets at issue.

157.   Home buyers, sellers, and their agents will be harmed by the anticompetitive effects directly resulting from Defendants' conspiracy. By steering their captive members to their own product, Defendants insulate themselves from competition and the need to innovate. Agents do not have a choice in the scheduling software to use and are left with an inferior service, adding inefficiency and friction to a central part of real estate transactions. Consumers are directly harmed by these inefficiencies as tours will be delayed. These delays will result in a decrease in the number of tours and successful leads, and less efficient property transactions. Buyers can miss out on a sale, and sellers can miss out on an offer, due to these delays.

158.   There are no procompetitive justifications for Defendants' conduct. Defendants will benefit substantially from their anticompetitive scheme to the detriment of home buyers, sellers, and agents. The scheme is designed only to enrich Defendants by hindering competitors of Aligned Showings, in which they have a financial and ownership interest.

44

159.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiffs have been injured in their business and property.

**Count II:  Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2: Attempt to Monopolize (as to MLS Defendants)**

160.    Plaintiffs repeat and incorporate each and every allegation set forth in the preceding paragraphs of this Complaint.

161.    In terminating their integrations with ShowingTime, ARMLS and Metro MLS acted with the specific intent of monopolizing the market for showing management platforms in ARMLS's and Metro MLS's coverage areas, respectively.

162.    ShowingTime has an existing course of dealing with ARMLS and Metro MLS as an incumbent vendor for the showing management platform in ARMLS's and Metro MLS's coverage areas.  ShowingTime was integrated into the MLS member portals for both MLS Defendants.  Rather than continue this course of dealing or go through a competitive bid process, MLS Defendants worked to degrade ShowingTime and steer their members away from it, terminating the course of dealing.

163.    ShowingTime, and other industry participants like brokerages operating in MLS Defendants regions such as Opendoor Brokerage, have reasonably relied on this course of dealing in investing in and improving their products.

164.    The course of dealing with ShowingTime was presumably profitable for MLS Defendants as it continued for years when they had other options.  Although MLS Defendants paid fees to ShowingTime, they presumably recouped this expense through membership fees.  ShowingTime offered to waive the fees paid by the MLS and provide its platform to the MLS Defendants for free, but MLS Defendants refused that offer.  On information and belief, they rebuffed this offer and instead moved forward with substantially foreclosing ShowingTime from their markets.  The only conceivable reason MLS Defendants would choose to remove ShowingTime's integration—particularly when they have the ability to continue offering that integration to their members *for free*—

is to forsake the short-term benefits MLS Defendants and their members derive from having a choice between two showing management platforms in order to implement their scheme to shut ShowingTime out from competing entirely.

165.   Given MLS Defendants' monopoly over the MLS Services, and their control over the member portals through which agents access those services, their scheme has a high likelihood of success.  MLS Defendants can effectively discourage their members from dealing with ShowingTime and steer them to their own product.  They can, and will, make Aligned Showings the only integrated scheduling software on their MLS and make it prohibitively difficult for agents to use ShowingTime, even though many prefer that product.

166.   As a direct and proximate result of Defendants' past and continuing violation of Section 2 of the Sherman Act, Plaintiffs have been injured in their business and property.

**Count III:  Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2: Denial of Access to an Essential Facility (as to MLS Defendants)**

167.   Plaintiffs repeat and incorporate each and every allegation set forth in the preceding paragraphs of this Complaint.

168.   MLS Defendants control a facility essential to compete in the market for showing management platforms in a particular MLS region: their member portals.  They each have exclusive and total control of their own member portal, which is the means by which agents access the MLS Services in which the MLS Defendants hold a monopoly in their regional markets.

169.   ShowingTime cannot compete in the relevant geographic markets without integration into the ARMLS and Metro MLS member portals.  ShowingTime's value is built on increasing agents' efficiency and productivity by automating the scheduling of showings, agent previews, inspections, and more.  To do this effectively, ShowingTime must have most or all of the listings of interest available on the platform and the ability to contact listing agents directly through the platform.

170.    There are no reasonable alternatives to the MLS member portal.   All member agents are required to list their properties, ensuring the MLS member portal offers the most comprehensive source of property listings.   All members have to access the MLS member portal to perform the basic duties of their jobs.   It would be prohibitively burdensome, time-consuming, technologically complicated, and expensive to attempt to recreate this listing data from individual brokerages (or in some cases, agents), if possible at all, or to onboard each individual agent as a ShowingTime user.   According to ARMLS, it has over 42,000 subscribers.[34]   Metro MLS has over 9,000 members.[35]

171.    It is clearly feasible for ARMLS and Metro MLS to provide this integration to ShowingTime since they have done so for years.   They are also able to support multiple showing management services, as evidenced by their support for both ShowingTime and Aligned Showings for a period of time and by other MLSs that offer more than one choice. Further, ShowingTime has made it financially advantageous to provide access as it has offered to provide ShowingTime for MLS for free, and to integrate data-sharing between ShowingTime and Aligned Showings so that the two platforms can co-exist on the member portal conveniently for agents.

172.    As a direct and proximate result of MLS Defendants' past and continuing violation of Section 2 of the Sherman Act, Plaintiffs have been injured in their business and property.

**Count IV:  Violation of Section 2: Conspiracy to Monopolize (as to all Defendants)**

173.    Plaintiffs repeat and incorporate each and every allegation set forth in the preceding paragraphs of this Complaint.

174.    MLS Defendants possess monopoly power over the MLS Services in the relevant geographic areas.   Together with MLS Aligned, they are conspiring to leverage this monopoly power into the market for showing management software.

---

[34] Who is ARMLS?, ARMLS, https://armls.com/who-are-armls-subscribers-2 (last visited December 22, 2023).
[35] About Metro MLS, Metro MLS, https://metromls.com/about-metro-mls/ (last visited December 22, 2023).

175.    Through their conspiracy, Defendants are seeking to gain monopoly power in the relevant geographic markets for showing management platforms by discouraging use of other software and steering agents to their own product, Aligned Showings, in which they have a financial and ownership interest.  In doing so, Defendants have the specific intent to gain monopolies in the specific geographic areas.

176.    There is a dangerous probability that they will succeed because MLS Defendants' monopoly power over the MLS Services and their control over the member portals through which those services are accessed gives them the ability to degrade competing offerings and steer customers to Aligned Showings, foreclosing competition in their markets.

177.    As a direct and proximate result of Defendants' past and continuing violation of Section 2 of the Sherman Act, Plaintiffs have been injured in their business and property.

## X.    PRAYER FOR RELIEF

178.    Accordingly, Plaintiffs request that the Court:

A.    Adjudge and decree that Defendants' conduct as alleged herein violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

B.    Award Plaintiffs compensatory and trebled damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

C.    Award Plaintiffs attorneys' fees and costs pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

D.    Award Plaintiffs pre-judgment and post-judgment interest as allowed by law on all sums awarded;

E.    Issue injunctive relief, pursuant to federal law including Section 16 of the Clayton Act, 15 U.S.C. § 26, that enjoins and restrains Defendants from continuing their unlawful acts in violation of the Sherman Act; and

F.   Order and award all other relief to Plaintiffs as the Court deems just and proper, or the law may allow.

## XI.   JURY DEMAND

179.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

DATED this 22nd day of December, 2023.

OSBORN MALEDON, P.A.

By _s/ David B. Rosenbaum_
    David B. Rosenbaum
    Joseph N. Roth
    2929 North Central Ave., Suite 2000
    Phoenix, Arizona 85012-2793

WILSON SONSINI GOODRICH & ROSATI, P.C.

Beau W. Buffier, _pro hac vice_ forthcoming
201 Washington Street, Suite 2000
Boston, MA 02108
Telephone:   (617) 598-7800
bbuffier@wsgr.com

Eric P. Tuttle, _pro hac vice_ forthcoming
701 Fifth Avenue, Suite 5100
Seattle, WA  98104-7036
Telephone:   (206) 883-2500
eric.tuttle@wsgr.com

_Attorneys for Plaintiffs Zillow Group, Inc. and ShowingTime.com, LLC_

49