1 Colin P. Ahler (#023879)
  Ryan P. Hogan (#036169)
2 SNELL & WILMER L.L.P.
  One East Washington Street
3 Suite 2700
  Phoenix, Arizona  85004-2556
4 Telephone:  602.382.6000
  E-Mail: cahler@swlaw.com
5         rhogan@swlaw.com

6 *Attorneys for Defendant MLS Aligned, LLC*

7

8              UNITED STATES DISTRICT COURT

9                    DISTRICT OF ARIZONA

10 Zillow Group, Inc. and ShowingTime.com,        No. 2:23-cv-02701-MTL
   LLC,
11                                                 **MOTION TO DISMISS**
                  Plaintiffs,
12                                                 (Oral Argument Requested)
          v.
13
   Arizona Regional Multiple Listing Service,
14 Inc., Multiple Listing Service, Inc., and
   MLS Aligned, LLC,
15
                  Defendants.
16

17        In accordance with Fed. R. Civ. P. 12(b)(6), Defendant MLS Aligned, LLC ("MLS

18 Aligned") moves to dismiss with prejudice the two claims asserted against MLS Aligned in

19 the Complaint (Doc. 1): Counts I and IV. To avoid repetition, this Motion primarily focuses

20 on defects in the Complaint that are specific to MLS Aligned. However, MLS Aligned also

21 agrees with and joins the separate motion to dismiss filed by the two so-called "MLS

22 Defendants"—Arizona Regional Multiple Listing Service, Inc. ("ARMLS") and Multiple

23 Listing Service, Inc. ("Metro MLS")—to the extent that motion pertains to Counts I and

24 IV.[1] A Notice and Certification of Conferral has been filed contemporaneously with this

25 Motion; the parties have conferred and did not agree the pleadings could be cured by

26 permissible amendment.

27

28 _____
   [1] Counts II and III of the Complaint are asserted only against the MLS Defendants.

1

**INTRODUCTION**

2      In January 2023, MLS Aligned introduced "Aligned Showings" as another
3 competitor in an already crowded field of at least six other companies that provide real
4 estate showing management services. These companies compete against each other for
5 contracts for integration on the member portals of multiple listing services ("MLSs") and
6 also sell premium services to individual real estate agents and brokerages. The MLSs play
7 these competitors against each other to obtain the best deal for their members, and they use
8 member dues to recoup the amounts they pay to the showing platforms. MLSs can choose
9 to have zero, one, or more than one showing platforms integrated into their member portals.
10 The MLSs' decision of how many platforms to integrate implicates costs—both in terms of
11 paying the showing platform for its services, as well as providing training and technical
12 support for the members of the MLS.

13      ShowingTime.com, LLC ("ShowingTime") has been quite successful under this
14 framework, with its products "used in *hundreds* of MLSs across the country." (Doc. 1 ¶ 34
15 (emphasis added).) Still, ShowingTime and its parent, Zillow Group, Inc. ("Zillow"),
16 contend they are victims of a collective boycott and a monopolization scheme because they
17 allegedly lost (or will lose) integration on *two* MLS portals. In addition to the defects with
18 the Complaint raised in the MLS Defendants' motion to dismiss, Plaintiffs' claims against
19 MLS Aligned under Sections 1 and 2 of the Sherman Act fail for two common reasons.

20      First, although both claims against MLS Aligned are premised on an alleged
21 conspiracy, Plaintiffs do not allege facts to plausibly show that MLS Aligned agreed with
22 either of the two MLS Defendants to exclude ShowingTime from the member portal of
23 either MLS Defendant. They do not allege any direct evidence of such an agreement. Nor
24 do they allege any parallel conduct by MLS Aligned with either MLS Defendant. The only
25 purported "coordinated" action alleged in the Complaint involves the notice by the *two MLS*
26 *Defendants*, a few months apart, that they would no longer include integrate ShowingTime
27 on their respective portals. (Doc. 1 ¶¶ 10, 65–66, 68.) Plaintiffs likewise fail to plead any

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona  85004-2556
602.382.6000

"plus factors" against MLS Aligned. Their apparent "plus factor" allegations are instead directed solely at the MLS Defendants or are not plus factors at all.

Simply, Plaintiffs' claims are not supported by anything that MLS Aligned allegedly did. Indeed, Plaintiffs sometimes allege only that "*[t]he MLS Defendants* have collectively agreed to boycott ShowingTime." (Doc. 1 ¶ 70 (emphasis added).)

Second, Plaintiffs do not plead facts to plausibly demonstrate that MLS Aligned committed any anti-competitive conduct, a necessary element of both their Sherman Act claims against MLS Aligned. Assuming arguendo that Plaintiffs had adequately pleaded that MLS Aligned entered into an agreement with either MLS Defendant to exclude ShowingTime, this would establish nothing more than exclusive dealing arrangements. Such arrangements would not prevent ShowingTime from continuing to compete for integration contracts with the hundreds of other MLSs across the country. Exclusivity would merely be a symptom of the existing framework where showing platforms compete for integration contracts with the many MLSs, to the benefit of the MLSs and their members. The natural consequence of that framework is that showing management platforms are not guaranteed integration with any particular MLS member portal, or the alleged benefits integration may bring with respect to selling to agents their premium features within a portal. In short, an exclusive dealing agreement between a showing platform and an MLS does not substantially foreclose competition in any line of commerce—a necessary component of an exclusive dealing claim.

This Court should dismiss Counts I and IV as asserted against MLS Aligned.

## **FACTUAL ALLEGATIONS OF COMPLAINT**[2]

"[T]he primary function of an MLS is to collect, aggregate, and distribute . . . for-sale listings data on the available homes in a particular geography." (Doc. 1 ¶ 24.) Individual MLSs make this data available to real estate agents through a "member portal." (*Id.* ¶ 6.)

---

[2] This Motion assumes the truth of Plaintiffs' factual allegations.

In addition to listings data, "the MLS member portal also gives its members access to other ancillary services provided by the MLS as member benefits." (*Id.* ¶ 29.) One ancillary service is "showing management services," which "help coordinate times for buyers, appraisers, and inspectors to visit a property." (*Id.* ¶ 6.) Plaintiffs allege that "many"—but not all—MLSs "contract with third-party vendors" to provide showing management services to their members. (*Id.* ¶ 29; *see also id.* ¶ 86 (alleging that MLS portals "*may* integrate software for showing management") (emphasis added).)

In particular, "MLSs typically contract with showing management platforms for systemwide distribution on the MLS member portal." (*Id.* ¶ 48.) "MLSs will play competing vendors against each other for access to this critical distribution channel in an attempt to secure the best possible services at the lowest possible price for members." (*Id.*) "The MLS recoups the cost of these third party services through the dues paid by members." (*Id.*)

For those MLSs that do procure showing services on their member portal, Plaintiffs allege that some—but not all—of the MLSs "contract with multiple vendors for such integrations." (*Id.*) In other words, an individual MLS may contract with zero, one, or more than one showing platforms for integration on its portal. When an MLS does elect to provide an ancillary service to members (like showing management), it also provides "training and technical support" for that service. (*Id.* ¶ 29; *see also id.* ¶ 88 ("The MLS provides training and technical support for integrated services . . . .").)

ShowingTime launched in 1999, has been providing "showing services . . . for decades", and is "used in hundreds of MLSs across the country." (*Id.* ¶¶ 34, 60.) Plaintiff Zillow is "the (indirect) parent company of" ShowingTime. (*Id.* ¶ 15.)

In addition to ShowingTime, there are at least six "other companies providing showing management services." (*Id.* ¶ 33.) This group includes MLS Aligned and its "Aligned Showings" product. (*Id.*) Showing platforms derive revenue from integration contracts with individuals MLSs as well as by selling premium features to real estate agents and brokerages. (*See id.* ¶¶ 7, 42, 75.) Showing platforms can sell premium features within or outside an MLS portal, although Plaintiffs contend that they have made the ShowingTime

product "particular[ly]" reliant on portal integration. (*Id*. ¶ 50; *see also* ¶¶ 52–53 (discussing how agents can use ShowingTime without portal integration).) But Plaintiffs also allege that approximately 20% of tours scheduled on ShowingTime in the ARMLS region came from somewhere else than a ShowingTime button on the ARMLS portal. (*Id*. ¶ 50.)

The Complaint's factual allegations concerning actions taken by MLS Aligned are slim. Plaintiffs discuss the formation of MLS Aligned in 2021, the introduction of Aligned Showings in January 2023, and the subsequent launch of Aligned Showings on some of the MLSs that have an ownership interest in MLS Aligned. (*See id*. ¶¶ 56–59, 61–62.) They also allege that "Aligned Showings will not agree to integrate on the backend with ShowingTime." (*Id.* ¶ 150.) Plaintiffs characterize MLS Aligned as "a collaborative entity managed jointly by six member MLSs, including" the two MLS Defendants. (*Id.* ¶ 71.)

The two MLS Defendants, by comparison, are among the "hundreds" of MLSs across the country. (*Id.* ¶¶ 17–18, 34.) ARMLS launched Aligned Showings on its member portal on September 6, 2023. (*Id.* ¶ 63.) On November 13, ARMLS announced that ShowingTime would be removed from its portal, effective December 27, 2023. (*Id.* ¶¶ 66–67.) Metro MLS launched Aligned Showings on December 5, and, according to Plaintiffs, "plans to completely remove the Showing Time integration in February 2024." (*Id.* ¶ 68.)

Before making the decision to exclusively use Aligned Showings, "ARMLS and Metro MLS had previously been paying a monthly service fee to give its members access to ShowingTime's core scheduling product." (*Id.* ¶ 73.) Plaintiffs allege that they offered the MLS Defendants to reduce the fee for the "base calendaring software" to zero, but both MLS Defendants declined this offer. (*Id.*)

Other MLSs that are members of MLS Aligned have also launched Aligned Showings on their member portals. (*Id*. ¶¶ 61, 62.) Although the MLS Defendants only represent one-third of the six members of MLS Aligned, (*id*. ¶¶ 19, 71), Plaintiffs do not contend that any of the other four member MLSs have decided to exclusively integrate Aligned Showings on their respective member portals and exclude ShowingTime.

1

## **ARGUMENT**

2

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient

3

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

4

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S.

5

544, 570 (2007)). Those "[f]actual allegations must be enough to raise a right to relief above

6

the speculative level." *Twombly,* 550 U.S. at 555. "Threadbare recitals of the elements of a

7

cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S.

8

at 678. Neither of Plaintiffs' two claims against MLS Aligned satisfy this standard.

9

## **I.    Plaintiffs Fail to Plead a Section 1 Claim Against MLS Aligned.**

10

In Count I, Plaintiffs contend that all Defendants violated Section 1 of the Sherman

11

Act by agreeing to a "group boycott of ShowingTime." (Doc. 1 ¶ 156.) Section 1 prohibits

12

"[e]very contract, combination . . . or conspiracy, in restraint of trade." 15 U.S.C. § 1. But

13

"[c]ourts have long read Section 1 to outlaw only *unreasonable* restraints." *Epic Games,*

14

*Inc. v. Apple, Inc.,* 67 F.4th 946, 981 (9th Cir. 2023) (internal quotations and citation

15

omitted). "Thus, a Section 1 inquiry has both a threshold component (whether there is a

16

contract, combination, or conspiracy) and a merits component (whether it is unreasonable)."

17

*Id.* Plaintiffs fail to plead either component against MLS Aligned.

18

### **A.    Plaintiffs Fail to Allege Facts to Plausibly Infer that MLS Aligned Agreed with Either MLS Defendant to Boycott ShowingTime.**

19

20

The requisite agreement for a Section 1 claim may be shown by direct or

21

circumstantial evidence. *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822 (9th

22

Cir. 2023). Plaintiffs do not allege either type of evidence against MLS Aligned.

23

1.    *Plaintiffs Do Not Allege Direct Evidence of a Group Boycott.*

24

"Direct evidence is smoking-gun evidence that 'establishes, without requiring any

25

inferences' the existence of a conspiracy." *Honey Bum*, 63 F.4th at 822 (citation omitted);

26

*see also Pharmacychecker.com LLC v. Legitscript LLC*, 614 F. Supp. 3d 796, 809 n.13 (D.

27

Or. 2022) (listing as examples "written documents, audio or video recordings, or eyewitness

28

testimony about what was said"). Plaintiffs allege nothing like that here. The Complaint

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

1  does not reference any "smoking gun" that would directly show that MLS Aligned agreed

2  with either MLS Defendant to exclude ShowingTime from their respective member portals.

3        2.    *Plaintiffs Do Not Allege Circumstantial Evidence of a Group Boycott.*

4        In the absence of direct evidence, Plaintiffs must allege circumstantial evidence of

5  an agreement, which must include both "parallel conduct" and "plus factors that tend to

6  exclude the possibility that the alleged conspirators acted independently." *Honey Bum*, 63

7  F.4th at 822 (cleaned up). Parallel conduct can exist, for example, when "competitors

8  adopt[] similar policies around the same time in response to similar market conditions." *In*

9  *re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015).

10       However, because "allegations of parallel conduct . . . could just as well be

11 independent action," *Twombly*, 550 U.S. at 555–57, courts also require "plus factors" to

12 distinguish permissible conduct from "economic actions and outcomes that are largely

13 inconsistent with unilateral conduct but largely consistent with explicitly coordinated

14 action." *In re Musical Instruments*, 798 F.3d at 1194. Put differently, an antitrust plaintiff

15 must allege facts that place the "parallel conduct in a context suggesting a preceding

16 agreement." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust*

17 *Litig.*, 28 F.4th 42, 47 (9th Cir. 2022). By contrast, "'[a]llegations of facts that could just as

18 easily suggest rational, legal business behavior by the defendants as they could suggest an

19 illegal conspiracy' are insufficient to plead a § 1 violation." *In re Musical Instruments*, 798

20 F.3d at 1194 (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008)).

21 "This higher standard is warranted by practical considerations in antitrust cases, where

22 proceeding to discovery 'frequently causes substantial expenditures and gives the plaintiff

23 the opportunity to extort large settlements even where he does not have much of a case.'"

24 *In re DRAM*, 28 F.4th at 47 (citation omitted).

25       Here, Plaintiffs fail at both steps of the circumstantial evidence test. They fail to

26 allege parallel action by MLS Aligned and either MLS Defendant, and they fail to allege

27 any plus factors that pertain to MLS Aligned.

28

Snell & Wilmer

L.L.P.

LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona  85004-2556
602.382.6000

a.      Plaintiffs Do Not Allege Parallel Action by MLS Aligned.

Because they are relying on circumstantial evidence of an alleged collective agreement to boycott, Plaintiffs must plead facts demonstrating that *each* defendant engaged in parallel conduct in order to state a viable Section 1 claim against *each* defendant. *See In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 770, 775 (D. Minn. 2020) (dismissing single defendant due to failure to allege parallel conduct by that defendant); *In re Travel Agent Comm'n Antitrust Litig.*, 2007 WL 3171675, at *4 (N.D. Ohio Oct. 29, 2007) ("Because Plaintiffs failed to allege that KLM engaged in parallel conduct, the claims against KLM must also be dismissed."); *see also In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 364 (S.D.N.Y. 2019) ("[T]here must be something in the complaint that ties *each* defendant to the conspiracy.") (emphasis added).

Here, the Complaint does not contain any allegations that MLS Aligned engaged in parallel conduct with either MLS Defendant. Plaintiffs instead assert that *the MLS Defendants* acted "[i]n coordinated fashion" by allegedly giving notice, several months apart, that ShowingTime would no longer be integrated on their portals. (Doc. 1 ¶¶ 10, 65–66, 68.) There is no allegation that MLS Aligned made such announcements, and so Plaintiffs' allegation of parallel conduct does not apply to MLS Aligned. (*See id.* ¶¶ 65, 66, 68 (alleged statements not attributed to MLS Aligned).) For this reason alone, Plaintiffs fail to plead, through circumstantial evidence, that MLS Aligned joined the alleged boycott.

b.      Plaintiffs Do Not Allege Plus Factors Against MLS Aligned.

Because Plaintiffs fail to allege parallel conduct by MLS Aligned, this Court need not proceed to an evaluation of "plus factors" in order to dismiss Count I against MLS Aligned. *See Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) ("'Plus factors' are relevant only if the complaint adequately alleges parallel conduct among the defendants.") (citation omitted). However, even if Plaintiffs had alleged parallel conduct by MLS Aligned, they have not alleged any plus factors against MLS Aligned to plausibly infer that such (hypothetical) parallel conduct was the product of coordinated action rather than rational, independent decision-making. Thus, they fail to

plausibly allege that MLS Aligned agreed to the supposed "boycott" of ShowingTime.

>(1)     The Plus Factor Allegations Mostly Concern Other
>        Defendants.

The Complaint does not explicitly identify any plus factors. But the Complaint allegations that appear to be included for "plus factor" purposes suffer a similar defect as Plaintiffs' apparent "parallel conduct" allegations: for the most part, the allegations are directed at the MLS Defendants and simply do not apply to MLS Aligned.

First, Plaintiffs suggest that the *MLS Defendants* acted against their self-interest by removing ShowingTime integration, despite ShowingTime's alleged offer to provide a "base" service for free and despite customer complaints. (*See* Doc. 1 ¶ 72, 73, 105.) Even setting aside whether these allegations constitute a plus factor, the allegations do not apply to MLS Aligned.[3] Plaintiffs do not allege that MLS Aligned acted against self-interest.

Second, Plaintiffs allege that "common talking points and messaging" were used to justify the removal of ShowingTime from the MLS Defendants' portals. (*Id.* ¶ 123.) But, according to Plaintiffs, the MLS Defendants issued those "talking points and messaging"— not MLS Aligned. (*See id.* ¶¶ 107–11 (alleged statements by ARMLS), ¶¶ 114–19 (alleged statements by Metro MLS).) In any event, public-facing statements support the existence of a conspiracy only when they could be construed as "invitations to agree." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008) (citing statements encouraging other manufacturers to limit production). Otherwise, "public statements" about "observations, predictions, and strategies for the future" are not considered plus factors. *See, e.g.*, *In re DRAM*, 28 F.4th at 50; *In re Nat'l Ass'n of Music Merchants, Musical Instruments & Equip. Antitrust Litig.*, 2012 WL 3637291, at *4 (S.D. Cal. Aug. 20, 2012) (a communication "delivered to a large, general audience . . . . isn't a 'plus factor' at all").

---

[3] The MLS Defendants' motion to dismiss persuasively demonstrates that the MLS Defendants did *not* act against their self-interest but instead had several rational reasons to each independently decide to exclusively integrate Aligned Showings on their respective portals, including their desire to have a showing management platform based on what they believe their members want, avoiding acquisition anxiety, and adhering to internal philosophies about avoiding the procurement of services from an MLS member.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona  85004-2556
602.382.6000

Third, Plaintiffs contend that the two MLS Defendants collaborate through a "noncontiguous joint venture." (Doc. 1 ¶ 71 n.18.) But Plaintiffs do not suggest that MLS Aligned has any involvement in the venture.

>            (2)    The Complaint Allegations that Might Pertain to MLS
>                   Aligned are Not Plus Factors.

To the extent that other Complaint allegations possibly pertain to MLS Aligned, those allegations fail to "place" any "parallel conduct in a context suggesting a preceding agreement." *In re DRAM*, 28 F.4th at 47. Thus, they do not constitute plus factors, whether considered individually or as a whole.

For instance, Plaintiffs appear to argue that all three Defendants shared a "motive" to collude because they were all interested in MLS Aligned's financial success. (*See* Doc. 1 ¶ ¶ 70–71.) "But common motive does not suggest an agreement." *In re Musical Instruments*, 798 F.3d at 1194 (competitors' motive to engage in price fixing to increase profits is not a plus factor). On the contrary, the MLS Defendants' financial interest in the success of MLS Aligned "could just as easily suggest [a] rational" basis for each MLS Defendant to independently decide that it wanted to exclusively use Aligned Showings on its respective member portal. *In re Musical Instruments*, 798 F.3d at 1194 (internal quotation and citation omitted); *cf. TruePosition, Inc. v. LM Ericsson Tel. Co.*, 844 F. Supp. 2d 571, 596 (E.D. Pa. 2012) ("[T]he possibility of independent conduct cannot be excluded when a company with an economic motive to disfavor a competing technology in fact disfavors that very technology.").

Plaintiffs similarly argue that all Defendants shared an "opportunity to collude" because the CEOs of the two MLS Defendants serve on the six-member Board of Managers of MLS Aligned and, as such, were present at MLS Aligned meetings. (Doc. 1 ¶ 71, *see also id.* ¶ 122.) Although "*[a]typical* communications between alleged coconspirators can constitute a plus factor," this is only the case where "such communications . . . go beyond the 'standard fare' of business and trade-association practice." *Honey Bum*, 63 F.4th at 823 (emphasis added); *see also In re Travel Agent Comm'n*, 2007 WL 317165, at *9 (collecting

cases declining to view mere opportunity to conspire as a plus factor). Thus, in the analogous trade association context, mere participation in association activities with other alleged conspirators does not constitute a plus factor. *See*, *e.g.*, *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 918 (N.D. Cal. 2019) ("Membership in associations and attendance at trade meetings presents nothing more than an opportunity to collude, and an opportunity, without more, is insufficient to state a claim under § 1."); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 597–98 (N.D. Cal. 2019) (plaintiff failed to allege "a meaningful plus factor" where complaint contained no "specific allegations" of what alleged conspirator agreed to during trade organization functions).

Here, Plaintiffs do not allege that any "atypical" communications took place at MLS Aligned meetings. Nor do they allege any facts to suggest that MLS Aligned entered into any side agreements with either MLS Defendant at these meetings. *See In re DRAM*, 28 F.4th at 52 (holding that participation in trade association meetings did not constitute plus factor when "Plaintiffs do not allege facts demonstrating that Defendants actually communicated or exchanged information [on supply plans] at these trade association meetings, much less that they entered an agreement to coordinate supply decisions while there"). The mere allegation that MLS Aligned meetings took place is not a plus factor.

Plaintiffs' allegation that MLS Aligned and the MLS Defendants share some leadership and employees is not a plus factor either. (*See* Doc. 1 ¶¶ 57, 71.) *Kendall* is instructive. There, plaintiffs alleged that defendant banks conspired with each other and credit card "Consortiums" to fix different fees. *Kendall*, 518 F.3d at 1048. They attempted to allege such an agreement by asserting that the banks "participate[d] in the management of and ha[d] a proprietary interest in" the Consortiums. *Id.* The Ninth Circuit rejected this argument and dismissed the banks due to the lack of an agreement. *Id.* The court explained that "membership in an association does not render an association's members automatically liable" for the association's activities and "*[e]ven participation on the association's board of directors is not enough by itself*" to establish a conspiracy. *Id.* (emphasis added).

The same rationale applies here: the mere allegation that the MLS Defendants

participated on the MLS Aligned Board and loaned employees to MLS Aligned does not lend itself to a plausible inference that MLS Aligned entered into an agreement with either MLS Defendant to "boycott" ShowingTime from their portals. Shared leadership or employees is instead just a way to recast *opportunity* to collude, which does not suggest a preceding agreement between MLS Aligned and either MLS Defendant.

Indeed, four other MLSs are represented on the Board of Managers of MLS Aligned, and at least some of these MLSs have launched Aligned Showings on their own portals. (Doc. 1 ¶¶ 57, 61–62, 71.) Yet, Plaintiffs do not allege that any of these non-party MLSs also decided to exclude ShowingTime from their member portal. This is further support for the only plausible inference: the MLS Defendants independently decided to make Aligned Showings the exclusive showing management platform on their portals.

## B. Plaintiffs Fail to Allege an Unreasonable Restraint of Trade.

As discussed, Plaintiffs' allegations that MLS Aligned launched on the MLS Defendants' portals, and that each MLS Defendant later gave notice that their contracts with ShowingTime would not be renewed, does not plausibly demonstrate that *MLS Aligned* agreed with either MLS Defendant on non-renewal. But even if they did, Plaintiffs have alleged nothing more than two exclusive dealing arrangements—i.e., agreements that MLS Aligned would be the exclusive, integrated showing platform on a portal.

This is true notwithstanding the "group boycott" label that Plaintiffs place on Count I. "It is not an antitrust 'boycott' when one supplier enters into an exclusive supply agreement with one customer, even though the supplier's competitors are 'foreclosed' from that customer for the life of the contract." *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 659 (8th Cir. 2000); *see also Kochert v. Greater Lafayette Health Servs., Inc.*, 372 F. Supp. 2d 509, 516 (N.D. Ind. 2004) (exclusive service agreement between hospital and physician group did not constitute group boycott); *Orthopedic Studio, Inc. v. Health Ins. Plan of Greater N.Y., Inc.*, 1996 WL 84503, at *3–4 (E.D.N.Y. Feb. 9, 1996) (rejecting "plaintiff's theory that [defendant's] decision to enter into an exclusive relationship with

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona  85004-2556
602.382.6000

two providers" was an illegal boycott).[4]

Plaintiffs cannot allege facts to plausibly show that an exclusivity arrangement between MLS Aligned and an MLS Defendant, even if it existed (which it did not), would constitute the sort of *unreasonable* restraint on competition that Section 1 requires. *See Epic Games*, 67 F.4th at 981. "There are . . . well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition." *Omega Envt'l, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997). Courts "thus analyze challenges to exclusive dealing arrangements under the antitrust rule of reason." *Id.* "[A]n exclusive dealing arrangement violates Section 1 only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'" *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) (quoting *Omega Envt'l*, 127 F.3d at 1162).

The substantial foreclosure requirement "serves a useful screening function." *United States. v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001), *abrogated on other grounds by Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006). "Permitting an antitrust action to proceed any time a firm enters into an exclusive deal would both discourage a presumptively legitimate business practice and encourage costly antitrust actions." *Id.*

Here, based on Plaintiffs' own description of how showing management companies compete against one another, Plaintiffs cannot satisfy the substantial foreclosure requirement. The first form of competition referenced in the Complaint concerns the competition among at least seven showing platforms for integration contracts with the "hundreds" of MLSs across the country. (*See* Doc. 1 ¶¶ 33, 34, 48.) Alleged exclusive dealing arrangements with *two* MLSs do not substantially foreclose competition in this line

---

[4] "The classic 'group boycott' is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 453 n.5 (9th Cir. 2021) (quoting *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Ass'n*, 672 F.2d 1280, 1284 (7th Cir. 1982)). Here, Plaintiffs do not allege that *any* Defendants compete against one another.

of commerce. ShowingTime (and all other competitors) can continue to compete for integration contracts from the many other MLSs. As ShowingTime concedes, it already does business with "hundreds" of MLSs. (Doc. 1 ¶ 34.)

The second downstream form of competition referenced in the Complaint concerns the sale of premium showing management features to agents. (*See id.* ¶¶ 7, 42, 75.) Plaintiffs cannot show substantial foreclosure of competition in this line of commerce because non-integration into two MLS portals supposedly makes it more difficult for ShowingTime to sell premium features to some agents.[5] As described by the Complaint, selling premium features as an integrated platform has *always* been dependent on first securing an integration contract from an MLS, with the MLSs "play[ing] competing vendors against each other" in order to obtain the best deal for the MLS and its members. (*Id.* ¶ 48.) The Complaint also acknowledges that some MLSs may choose to not integrate *any* showing platform on their portal or may select just one platform. (*See id.* ¶¶ 29, 48, 86.) This decision of how many platforms to integrate implicates costs for the MLS, including the vendor's fees and the costs associated with providing member training and technical support. (*See id.* ¶¶ 29, 48.)

In other words, the existing marketplace is *defined* by the exclusion of showing platforms from portal integration, as each MLS selectively decides which vendors (if any) to use. Competition is thus not foreclosed—let alone *substantially* foreclosed—because two portals that were previously open to ShowingTime move to another vendor. Plaintiffs' contrary theory would effectively impose an "open access" regime and require MLSs to make integration available to *all* showing platforms. This would not only be a vast departure from current practice, but it would also eliminate competition for MLS integration contracts, to the detriment of agents who pay for the ancillary services on an MLS through

---

[5] Selling premium features to an agent is not *dependent* on integration into that agent's MLS portal. (*See* Doc. 1 ¶ 50 (about 20% of ShowingTime tours in the ARMLS were not derived from the ARMLS portal), ¶¶ 52–53 (alleging how agents who wish to use ShowingTime may still do so with a different tab or new browser window).) Where "competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition any part of the relevant market." *Omega Envt'l*, 127 F.3d at 1163.

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

their member dues. (*See* Doc. 1 ¶ 48.) Plaintiffs' theory would likewise obliterate the discretion of MLSs to choose how many vendors to use and technically support.

MLS Aligned is aware of no authority to support an exclusive dealing claim that would require such a fundamental transformation of existing competition. Courts instead evaluate substantial foreclosure by considering "the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market." *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 111 (3d Cir. 1992) (internal quotations and citation omitted). Moreover, Plaintiffs' argument runs "afoul of longstanding precedent that 'as a general matter, the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1183 (9th Cir. 2016) (citation omitted). And "competition for the contract is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress." *Menasha Corp v. News Am. Mktg. In-Store*, 354 F.3d 661, 663 (7th Cir. 2004); *see also Minn. Ass'n of Nurse Anesthetists*, 208 F.3d at 661–62 ("In essence, plaintiffs claim a right under the antitrust laws to access *all* hospital surgeries as independent, direct-billing professionals. That claim is without merit.").

For all these reasons, Plaintiffs fail to plead that MLS Aligned agreed to any unreasonable restraint of trade.

## II.   Plaintiffs Fail to Plead a Conspiracy to Monopolize Claim Under Section 2.

In Count IV, Plaintiffs contend that all Defendants conspired to monopolize "relevant geography markets for showing management platforms." (Doc. 1 ¶ 175.) "To prove a conspiracy to monopolize in violation of § 2, [a plaintiff] must show four elements: (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). "Specific intent to monopolize and anticompetitive acts designed to effect that intent are

required for a conspiracy to monopolize claim." *Stanislaus Food Prods v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1078 (E.D. Cal. 2011) (cleaned up).

Plaintiffs' Section 2 conspiracy claim against MLS Aligned fails for substantially the same reasons as its Section 1 claim. The Complaint does not contain sufficient factual allegations to show, by direct or circumstantial evidence, that MLS Aligned agreed with either MLS Defendant to exclude ShowingTime from any MLS member portal. And even if Plaintiffs could satisfy this threshold requirement, their claim against MLS Aligned would merely involve exclusive dealing arrangements, which fall well short of the "anticompetitive acts" required for a Section 2 conspiracy to monopolize claim.

### A.    Plaintiffs Fail to Allege Facts that MLS Aligned Joined a Conspiracy.

Conspiracy claims under both Section 1 and Section share "the same prerequisite, that is, a showing of concerted action by the defendants." *Granddad Bread, Inc. v. Cont'l Baking Co.*, 612 F.2d 1105, 1111–12 (9th Cir. 1979). As discussed, Plaintiffs have not plead facts to plausibly infer that MLS Aligned entered into any agreement with the MLS Defendants to exclude ShowingTime from their portals. In the absence of such an agreement, the conspiracy to monopolize claim against MLS Aligned must be dismissed. *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1491 (9th Cir. 1991) (affirming grant of summary judgment on Section 2 conspiracy to monopolize claim when there was insufficient evidence of an agreement for a Section 1 claim); *Prime Healthcare Servs., Inc. v. Serv. Employees Int'l Union*, 2013 WL 3873074, at *16 (S.D. Cal. July 25, 2013), *aff'd*, 642 F. App'x 665 (9th Cir. 2016) ("Prime Healthcare has failed to plead the existence of a conspiracy for Section 1 violation, and thus has also failed to satisfy the first element for conspiracy to monopolize under Section 2.")

### B.    Plaintiffs Do Not Allege Anti-Competitive Acts by MLS Aligned.

"If, in reviewing an alleged Sherman Act violation, a court finds that the conduct in question is *not* anticompetitive under § 1, the court need not separately analyze the conduct under § 2." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020); *NYNEX Corp. v.*

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

1  *Discon, Inc.*, 525 U.S. 128, 139 (1998) ("We do not see, on the basis of the facts alleged,

2  how [plaintiff] could succeed on [its Section 2 conspiracy to monopolize] claim without

3  prevailing on its § 1 [group boycott] claim.").

4  As discussed, Plaintiffs have not pleaded any anticompetitive conduct against MLS

5  Aligned. Even if MLS Aligned agreed with an MLS Defendant to remove ShowingTime

6  from its portal (and it did not), this would amount to nothing more than an exclusive dealing

7  arrangement to make Aligned Showings the only integrated platform on that portal. Because

8  Plaintiffs cannot show that such hypothetical agreements would substantially foreclose

9  competition in any relevant line of commerce, the purported exclusivity agreements are not

10  anti-competitive and cannot provide the basis for a conspiracy to monopolize claim.[6]

11  Plaintiffs instead seek to erase: (1) MLSs' freedom to deal with the vendors they deem

12  appropriate; and (2) existing competition where MLSs "play competing vendors against

13  each other . . . in an attempt to secure the best possible services at the lowest possible price

14  for members." (Doc. 1 ¶ 48.) Because Plaintiffs cannot plead any anticompetitive acts, their

15  conspiracy to monopolize claim against MLS Aligned fails.

16  ## CONCLUSION

17  Plaintiffs do not allege facts to support their conclusion that MLS Aligned entered

18  into an exclusive dealing arrangement with either MLS Defendant. Even if they had, such

19  an agreement would not be anticompetitive in violation of the Sherman Act. In addition, the

20  MLS Defendants identify several other incurable defects with the Complaint. This Court

21  should dismiss Counts I and IV as asserted against MLS Aligned with prejudice.

22
23
24
25
26

---

[6] The MLS Defendants' motion to dismiss demonstrates that having one vendor integrated
on their platforms does not bar ShowingTime from any "essential facility." The rare
essential facilities case with merit is based on a refusal to *sell*. MLS Aligned is aware of no
essential facilities case holding that a defendant-*buyer* had to purchase a vendor's services.

DATED this 20th day of February 2024.

SNELL & WILMER L.L.P.


By: */s/ Colin P. Ahler*

Colin P. Ahler
Ryan P. Hogan
One East Washington Street
Suite 2700
Phoenix, Arizona  85004-2556
Telephone: 602.382.6000
Facsimile: 602.382.6070

*Attorneys for Defendant MLS Aligned, LLC*

- 18 -

1

**CERTIFICATE OF SERVICE**

2

      I hereby certify that on February 20, 2024, I electronically filed the foregoing with

3

the U.S. District Court Clerk's Office using the CM/ECF system for filing and transmittal

4

of a notice of electronic filing to the CM/ECF registrants.

5

6

*/s/ Abigail Bahorich*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28