1
2
3

**QUARLES & BRADY LLP**
One Renaissance Square
Two North Central Avenue
Phoenix, AZ 85004-2322
TELEPHONE 602-229-5200

4
5
6
7
8
9

Edward A. Salanga (#020654)
Edward.Salanga@quarles.com
Brian A. Howie (#026021)
Brian.Howie@quarles.com
Benjamin C. Nielsen (#029689)
Benjamin.Nielsen@quarles.com
Joseph P. Poehlmann (*Pro Hac Vice Forthcoming*)
Joseph.Poehlmann@quarles.com

*Attorneys for Defendants Arizona Regional*
*Multiple Listing Service, Inc. and Multiple Listing*
*Service, Inc.*

10

UNITED STATES DISTRICT COURT

11

DISTRICT OF ARIZONA

12

13
14

Zillow Group, Inc. and ShowingTime.com, LLC,

NO. 2:23-cv-02701-MTL

15

Plaintiffs,

16

v.

17
18

Arizona Regional Multiple Listing Service, Inc., Multiple Listing Service, Inc., and MLS Aligned, LLC,

19

Defendants.

**DEFENDANTS ARIZONA REGIONAL MULTIPLE LISTING SERVICE, INC.'S AND MULTIPLE LISTING SERVICE, INC.'S MOTION TO DISMISS THE COMPLAINT**

(Oral Argument Requested)

20
21
22
23
24
25
26
27

Pursuant to F.R.C.P. 12(b)(6), Defendants Arizona Regional Multiple Listing Service, Inc. ("ARMLS") and Multiple Listing Service, Inc. d/b/a Metro Multiple Listing Services, Inc. ("Metro") (collectively, "MLS Defendants"), move to dismiss the Complaint (Dkt. 1) with prejudice. As shown in the following Memorandum of Points and Authorities, Plaintiffs Zillow Group, Inc. ("Zillow") and ShowingTime.com, LLC ("ShowingTime") (collectively, "Plaintiffs") fail to state a claim against the MLS Defendants for violations of Section 1 or 2 of the Sherman Act.[1]

28

---

[1] Co-defendant MLS Aligned, LLC ("MLS Aligned"), named only in Counts I and IV, is filing a contemporaneous motion for dismissal of those claims. The MLS Defendants join

**MEMORANDUM OF POINTS AND AUTHORITIES**

The Court should look at this purported antitrust case with great skepticism from the outset. Even a cursory review of the Complaint makes clear that Plaintiffs' true grievance is not that the MLS Defendants are engaging in anticompetitive practices, but that ShowingTime—the dominant provider of showing management services nationally—is (ironically) now facing competition in a few regions. Although robust competition is the very cornerstone of American capitalism, Plaintiffs perceive it as a mortal threat and seek to weaponize the antitrust laws to kill it.

For many years, ShowingTime has occupied the dominant position with respect to selling showing management software to Multiple Listing Services ("MLSs"). In fact, ShowingTime has been integrated into the MLS portals operated by the MLS Defendants, as well as "hundreds" of other MLSs throughout the country. In some cases, such as with the MLS Defendants, ShowingTime was the sole showing management software integrated onto the MLS portal. Other MLSs choose to integrate more than one vendor. And other MLSs choose not to have any integrated vendor at all. Where integration is under consideration, MLSs "play competing vendors against each other" to achieve the best possible outcome for the MLS and its members.

In late 2023, with ShowingTime's contracts for integrated services ending in two regional markets, the MLS Defendants each made an independent assessment and determined it is in their best interests (and their subscriber members' best interest) to choose an alternate vendor to provide this integrated service. Specifically, the MLS Defendants chose to use a new showing management service (Aligned Showings) offered by MLS Aligned, a joint venture formed by the MLS Defendants and several other MLSs to give MLSs another option when selecting an integrated showing management vendor. By definition, the addition of a new player into an already crowded market ***increases*** competition, and the MLS Defendants obviously have a financial interest in the success of

in MLS Aligned's motion to dismiss. MLS Aligned and the MLS Defendants collectively referred to as "Defendants".

that joint venture. The independent business decisions made by the MLS Defendants to select Aligned Showings as its new, alternate provider of these integrated services are entirely justified and are not the product of any collusion or conspiracy. Moreover, the notion that ShowingTime's loss of *two* integration contracts in a national market of hundreds of MLSs should give rise to antitrust liability is unserious.

In fact, Plaintiffs' lawsuit attempts to stand antitrust law on its head. Courts long have affirmed that the "central purpose" of the antitrust laws is to preserve and foster competition. Those acts that result in *more* competition are therefore both consistent with, and further the basic goals of, the antitrust laws. Here, however, the dominant player in the market for showing management services (ShowingTime) and its corporate parent (Zillow) seek to impose antitrust liability on Defendants—and to recover treble damages, injunctive relief, and attorneys' fees—for alleged injuries that flow directly from an *increase* in competition. In other words, Plaintiffs' claims are directly at odds with the premise of the antitrust laws and, if successful, would subvert them.

*     *     *

Real estate agents rely on a variety of digital services and products to facilitate the listing, sale, and purchase of homes. One such service is a multiple listing service ("MLS"), which is a portal widely utilized by seller's and buyer's agents to "collect, aggregate, and distribute . . . for-sale listings data on the available homes in a particular geography." (Compl. ¶ 24). "The efficiencies associated with the use of an MLS in the real estate industry are well documented in the real estate, legal, and economic literature," and it is undisputed that MLSs provide "significant efficiencies and procompetitive features".[2]

Many MLSs provide ancillary services as benefits to their users. One such service is showing management software, through which a selling agent can schedule and coordinate

---

[2] Competition in the Real Estate Brokerage Industry, FTC, https://www.ftc.gov/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-us-department-justice, at 13–14 (cited in Compl. ¶ 24 n.6). The Court may consider this document and other materials referenced in the Complaint without converting this motion into a summary judgment motion. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

home showings with buyers' agents. (*Id.* ¶¶ 29, 33). Showing management software provides a way for agents to exchange contact information, information on how to access a home, and specific instructions regarding showings. (*Id.* ¶¶ 32–33). If the MLS chooses to do so, this software can be integrated on the MLS member's portal. (*Id.* ¶¶ 7, 35). With the direct integration of this software, an MLS can install a "button" that allows agents to schedule home showings without the need to go to another website or platform. (*Id.* ¶ 7).

ShowingTime has long occupied the dominant position in the market for showing management services, being used by over 370 MLSs—and over one million real estate agents—across North America.[3] (*Id.* ¶ 34). That success did not go unnoticed. In 2021, Zillow acquired ShowingTime. (*Id.* ¶ 3). As Plaintiffs' own press reflected, this acquisition was driven by ShowingTime's market position; ShowingTime had "developed relationships with ***hundreds*** of Multiple Listing Services (MLSs)."[4] A mere two of those MLSs were ARMLS and Metro. ARMLS operates an MLS aggregating for-sale home listings in metro Phoenix, and Metro operates a similar MLS for the greater Milwaukee metropolitan area. (*Id.* ¶¶ 17–18). Both ARMLS and Metro entered license agreements with ShowingTime and integrated its software directly into their MLS member portal. (*Id.* ¶ 60).

Plaintiffs allege that in 2021, ARMLS, Metro, and four other MLS entities (who Plaintiffs tellingly do not identify) formed the MLS Aligned joint venture. (*Id.* ¶¶ 8, 19, 56–57).[5] One goal for MLS Aligned was to develop innovative products that would support MLSs and their members on "critical workflows of the real estate transaction." (*Id.* ¶ 59). To that end, MLS Aligned acquired an existing messaging and showing platform, enhanced it, and marketed it as a new showing management software called "Aligned Showings." (*Id.*

---

[3] *See* Zillow Group to Acquire ShowingTime, the Industry Leader in Home Touring Technology, ShowingTime, https://www.showingtime.com/blog/zillow-group-to-acquire-showingtime-the-industry-leader-in-home-touring-technology/. (ShowingTime's website cited in Compl. ¶ 40 n. 8, ¶ 41 n. 9).

[4] *See supra* note 3 (emphasis added).

[5] This allegation is contrary to the public record. MLS Aligned was formed in the State of Delaware in 2018. *See* Exhibit A to this motion. The Court may take judicial notice of matters of public record without converting this motion into a motion for summary judgment. *See Daniels-Hall*, 629 F.3d at 998; *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir. 1986).

¶¶ 8, 56, 58, 61). Aligned Showings joined ShowingTime and at least five other competitors in the market for these products—BrokerBay, SentriKey Showing Service, Showingly, Calendly, and Lone Wolf Technologies. (*Id.* ¶ 33). In other words, the addition of Aligned Showings *increased* the number of providers of these products, giving MLSs an additional choice when selecting a vendor to integrate (if desired).

In light of this new product offering, ARMLS independently announced in September 2023 that it soon would be switching from ShowingTime to Aligned Showings. (*Id.* ¶ 63). ARMLS formally notified ShowingTime on October 2, 2023 that it would not be renewing the existing license agreement, which expired on December 30, 2023. Instead, Aligned Showings would be the sole integrated option on the ARMLS portal. (*Id.* ¶¶ 63, 65). Plaintiffs allege that Metro tentatively plans to migrate to Aligned Showings sometime in February 2024. (*Id.* ¶ 68). The Complaint, however, is silent as to what other MLSs are doing, including the four other MLSs who are members in the MLS Aligned joint venture. There are no allegations that any of those MLSs—the ones that actually have an integrated showing management product—will be switching from ShowingTime.

*     *     *

Plaintiffs allege claims under Sections 1 and 2 of the Sherman Act for unlawful group boycott, attempted monopolization, denial of access to an essential facility, and conspiracy to monopolize. All of these claims fail for multiple reasons.

**Antitrust Standing** – Neither ShowingTime nor Zillow has (or can) allege antitrust standing. First, neither Plaintiff can demonstrate that it has suffered an antitrust injury because the harms of which they complain flowed from an *increase* in competition, not from an injury to competition or other act that the antitrust laws were designed to prevent. Second, Zillow does not have antitrust standing because its alleged injuries are too indirect and remote, and its damages are too speculative.

**Counts I and IV (Group Boycott, Conspiracy to Monopolize)** – The Complaint does not identify any direct evidence of an "agreement" to boycott ShowingTime among anyone. Moreover, the MLS Defendants' decisions to switch from ShowingTime to

Aligned Showings can just as plausibly be attributed to independent action as to collusion. Finally, Plaintiffs' alleged relevant geographic markets—the areas "covered by the associated MLS" (Compl. ¶¶ 92–93)—are implausibly narrow and contrary to law. "[A] geographic market cannot be drawn simply to coincide with the market area of a specific company." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1249 (11th Cir. 2002).

**Count II (Attempted Monopolization)** – Plaintiffs' attempt to bring this case within the highly unusual fact pattern of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), is unavailing. Liability in that case was, as the Court itself later noted, "at or near the outer boundary of § 2". *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004). Since then, courts repeatedly have rejected efforts by antitrust plaintiffs to bring their cases within the very narrow exception to the general and well-settled rule that a business can freely choose the parties with whom it will deal. Here, the MLS Defendants (unlike in *Aspen Skiing*) had numerous legitimate business reasons for independently choosing to switch from ShowingTime to Aligned Showings.

**Count III (Essential Facilities)** – This claim fails because the MLS Defendants and ShowingTime are not competitors; because control of the facility does not give the MLS Defendants the power to ***eliminate*** competition in the downstream market for showing management services; and because Plaintiffs admit that ShowingTime continues to have access to the facility, meaning that the facility is not actually "unavailable".

## III.   LEGAL STANDARD

A complaint must be dismissed under Rule 12(b)(6) if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility requires enough factual content for a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp.*, 550 U.S. at 557). Moreover, "[d]ismissal with prejudice

and without leave to amend is appropriate when any amendment would be futile." *Atkinson v. Meta Platforms, Inc.*, 2021 WL 5447022, at *3 (9th Cir. Nov. 22, 2021).

## IV.   ARGUMENT

### A.   Neither Plaintiff Can Establish Antitrust Standing.

Courts in the Ninth Circuit evaluate several factors to determine whether a plaintiff has standing to bring a private antitrust action:

> (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall;
>
> (2) the directness of the injury;
>
> (3) the speculative measure of the harm;
>
> (4) the risk of duplicative recovery; and
>
> (5) the complexity in apportioning damages.

*City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 (9th Cir. 2021). Although courts are instructed to balance all factors, the first factor ("antitrust injury") is "mandatory", *id.* at 456, and required for both Section 1 and 2 of the Sherman Act (*i.e.*, all of Plaintiffs' claims), *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 811 (9th Cir. 1988). Antitrust injury has four components: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws are intended to prevent." *Id.* (citation omitted).

Here, neither ShowingTime nor Zillow alleges an antitrust injury. Rather, each alleges harm no different than had the MLS Defendants engaged in indisputably legal conduct—something antitrust law does not reach. This defect is fatal and incurable through amendment, so dismissal with prejudice is warranted. Also, Zillow's standing is flawed because its alleged injury is too indirect, remote, and speculative to be actionable.

### 1.   The Complaint Fails to Allege an Antitrust Injury.

First, Plaintiffs' alleged injuries are not the type of harm that the antitrust laws are intended to prevent. "The Supreme Court has made clear that injuries which result from ***increased*** competition or lower (but non-predatory) prices are not encompassed by the antitrust laws." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir.

7

1   1999) (emphasis in original). Such injuries do not equate to an antitrust injury, "even if the

2   defendant's conduct is illegal." *City of Oakland*, 20 F.4th at 457 (citation omitted). Indeed,

3   the antitrust laws "were enacted for 'the protection of competition not competitors.'"

4   *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 488 (1977) (quoting *Brown*

5   *Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

6       In *Brunswick*, bowling alley operators sued an equipment manufacturer (Brunswick)

7   following its purchase of distressed bowling alleys. 429 U.S. at 479–80. The operators

8   claimed the transaction prevented them from expanding their respective market shares,

9   thereby weakening them at the hands of a deep-pocketed purchaser. *Id.* at 480–81. After a

10  jury found in favor of plaintiffs, the appeal concerned whether a party had suffered an

11  antitrust injury where the damages were premised on the fact that competing alleys had

12  ***remained*** in business (via their acquisition), denying the plaintiffs an anticipated increase

13  in market shares that they claimed they would have realized had those competing alleys

14  been closed or allowed to fail. *Id.* at 481-83. The Court easily answered that question in the

15  negative because the alleged conduct actually ***increased*** competition: "It is inimical to the

16  purposes of these laws to award damages for the type of injury claimed here." *Id*. at 488.

17      Here, the Complaint similarly relies on allegations of increased competition in the

18  marketplace for showing management services. Plaintiffs concede that ShowingTime is one

19  of several firms providing showing management services, with ShowingTime being used

20  by over 370 MLSs and over one million real estate agents across North America. (Compl.

21  ¶¶ 33–34; *see also supra* n.3). They then decry the formation of MLS Aligned and the

22  development of Aligned Showings—*i.e.*, the introduction of a ***seventh*** competitor into the

23  same market. This development results in ***more choices*** for MLSs.[6] The antitrust laws were

24  never intended to prohibit an increase in competition.

25      Second, there is no antitrust injury if the injury would have occurred even without

26  the alleged violation. *Brunswick* again is instructive. The damages alleged there—lost

27

28  _____

[6] Plaintiffs do not allege that the MLS Defendants (or MLS Aligned) have restricted or have the ability to restrict the choices ***other*** MLS entities throughout the country make in selecting showing management software.

8

profits due to competing alleys being kept alive by a deep-pocketed purchaser—would have occurred through perfectly **legal** conduct. 429 U.S. at 487. Plaintiffs "would have suffered the identical 'loss' but no compensable injury had the acquired centers instead obtained refinancing or been purchased by 'shallow pocket' parents." *Id.*

The Ninth Circuit reached a similar conclusion in *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co. ("APS")*, 141 F.3d 947 (9th Cir. 1998). In *APS*, the court rejected an injury that resulted from an alleged group boycott by the only two buyers in the market for defense missile system parts after their supplier unevenly inflated its prices and shifted business to two new suppliers. *Id.* at 949. The Ninth Circuit held that the supplier lacked an antitrust injury because there was no harm to competition given that the lost business was shifted to new suppliers. *Id.* at 951–53.[7]

Similarly, the court in *Belcher Oil Co. v. Fla. Fuels, Inc*., 749 F. Supp. 1104 (S.D. Fla. 1990), found no antitrust injury in an alleged group boycott case involving cruise ship purchasers of maritime fuel who became dissatisfied with plaintiff (the sole fuel supplier), encouraged a new supplier to enter the market, and then entered into contracts with it:

> Hypothetically, an oil company called "X" might, on its own initiative, have offered bunker fuel supply contracts identical to the contracts that Belcher now challenges to the same cruise ship operators that in reality entered into contracts with Florida Fuels . . . . [E]ach of those ship operators, motivated by lower prices and the promise of a newly competitive market, might have rationally and independently accepted X's offer without giving Belcher the opportunity to make a counter-offer. Under such a scenario, there would have been no conspiracy and no illegal conduct, yet Belcher would have sustained injuries identical to those for which it now seeks recovery. This hypothetical scenario illustrates that ***the losses that Belcher now complains of were the result not of the defendants' allegedly illegal conduct, but of increased competition, and that these losses therefore do not constitute antitrust injury.***

*Id.* at 1107 (emphasis added).

---

[7] Although there was a temporary gap between suppliers, "a temporary decline in the number of competitors is not a significant restraint of trade," and "neither is a related temporary decline in quantity, quality, or efficiency." *APS,* 141 F.3d at 952.

The same reasoning applies here. The MLS Defendants could have extended their contracts with ShowingTime or (1) worked with one or more of ShowingTime's five existing competitors, (2) foregone an integrated scheduling button entirely, or (3) put their efforts behind a new provider of such services. The MLS Defendants chose option (3), but Plaintiffs' alleged harm would have been just the same had they chosen options (1) or (2). As a result, neither Plaintiff has—nor could—plead an antitrust injury.[8]

### 2.   Zillow Further Lacks Standing Because its Alleged Injury is Indirect and Remote, and its Damages are Speculative.

The causal connection between the act of replacing the integrated ShowingTime button with Aligned Showings and Zillow's harm is attenuated and speculative. Plaintiffs contend that if ShowingTime is not integrated on the MLS Defendants' listing portals, then the service's "touring functionality" and the "user experience" of the service is "degraded." (Compl. ¶¶ 105, 113, 141; *see also id.* ¶¶ 62, 69, 97, 131). That "degradation" in turn makes Zillow "less useful and attractive overall to consumers," which in turn ostensibly harms Zillow's "goodwill." (*Id.* ¶ 141). Plaintiffs also allege that home buyers who request to tour a property through Zillow are "***more likely*** to ultimately transact, making them high-value ***leads*** to Zillow's Premier Agent partners." (*Id.* ¶ 143 (emphasis added)). Because of the "degraded" functionality of ShowingTime, the Premier Agent partner's "first interaction with those high-intent home buyers seeking to schedule a tour will not be as smooth and ***may be delayed***, reducing the ***chance*** that the buyer will decide to continue working with the Premier Agent partner." (*Id.* ¶ 144 (emphasis added)). As a result, "these leads are less valuable to Premier Agent partners and to Zillow, resulting in less revenue to both." (*Id.*).

These are precisely the sort of vague and ambiguous allegations that the Ninth Circuit found insufficient to establish antitrust standing in *City of Oakland*. 20 F.4th at 459–60 ("There are too many speculative links in the chain of causation between Defendants' alleged restrictions on output and the City's alleged injuries."); *see also Sacramento Valley,*

---

[8] Plaintiffs' request for injunctive relief also requires establishing antitrust injury. *See Lucas v. Bechtel Corp.*, 800 F.2d 839, 847 (9th Cir. 1986); *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 112 (1986) (Section 16 of the Clayton Act "affords private plaintiffs injunctive relief only for those injuries cognizable under § 4.").

1   *Chapter of the Nat'l Elec. Contractors Ass'n v. IBEW, Local 340*, 888 F.2d 604, 608–09

2   (9th Cir. 1989) (union lacked antitrust standing where availability of lost work opportunities

3   was influenced by many independent factors beyond the alleged conspiracy); *Eagle v. Star-*

4   *Kist Foods, Inc.*, 812 F.2d 538, 541–42 (9th Cir. 1987) (no antitrust standing where injury

5   was derivative and dependent on decisions and conduct of independent intermediaries).

6           There is no direct connection between a potential buyer scheduling a tour through an

7   integrated button and actually closing on the purchase of a home. The Complaint suggests

8   that Zillow only derives revenue **if** there is a "real estate **transaction**" as opposed to only a

9   scheduled showing. (Compl. ¶¶ 142–43 (emphasis added)). But the process of purchasing

10  a home involves numerous decisions by multiple parties (including third parties)—*e.g.*, the

11  decision to make an offer, the decision to accept an offer, the negotiation of a purchase and

12  sale contract, the home inspection process, title searches, and obtaining the necessary

13  financing, to state a few. At any step, a transaction may fall through, or a buyer—or seller—

14  may choose to walk away from the deal, look in a different geographic area, and/or exit the

15  process entirely. The allegations suggest that Zillow realizes "revenue" only if **all** of these

16  decisions are made in a particular way, resulting in an actual sale. That chain of causation

17  is far too remote and tenuous to confer antitrust standing on Zillow.

18          Finally, Zillow's alleged damages are purely speculative—*e.g.*, "less useful and

19  attractive" Zillow website (flowing from a tour scheduling process that "may" be less

20  "smooth") and unspecified harm to Zillow's "goodwill." (*Id*. ¶¶ 141, 144). Such harms are

21  ephemeral and unquantifiable at best. And, as noted above, lost commission revenue

22  associated with real estate transactions based on sale price is unknown. Without knowing

23  exactly which home a potential buyer ultimately would purchase, including variables like

24  whether the sale price is higher or lower than the initial list price, it would be impossible to

25  calculate such damages. In *City of Oakland*, the Ninth Circuit described alleged harms such

26  as "lost investment value," "tax revenues associated with Raiders games," and "devaluation

27  of the [Oakland] Coliseum property" as "exceedingly difficult to calculate." 20 F.4th at 460.

28  That reasoning is fully applicable here and warrants dismissal of Zillow's claims.

**B.** **The Complaint Fails to Allege an Actionable Antitrust Violation.**

**1.** **The Complaint Fails to Allege an Illegal Agreement to Boycott or a Conspiracy to Monopolize (Counts I and IV).**

Count I alleges an unlawful agreement to boycott ShowingTime through the MLS Defendants' terminations of their respective ShowingTime contracts, thereby harming ShowingTime by conspiring to exclude it from competing in the Phoenix and Milwaukee markets for showing management services. (Compl. ¶ 156). Count IV alleges that, through this agreement, Defendants conspired to monopolize these markets.[9] (*Id.* ¶¶ 174–76). Both counts rely on the same alleged agreement, so the MLS Defendants address them together.

**a.** **Plaintiffs Fail to Plausibly Allege an *Agreement* (Counts I and IV).**

A prerequisite for a Section 1 claim is an agreement among multiple actors to unreasonably restrain trade. 15 U.S.C. § 1; *see also In re Musical Instr. & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015). The same is true under Section 2 when alleging an illegal conspiracy to monopolize. *See Arcell v. Google LLC*, 2023 WL 5336865, at *4 (N.D. Cal. Aug. 18, 2023) (dismissing conspiracy to monopolize claim based on failure "to allege plausible facts showing direct or circumstantial evidence to prove the existence of any agreement . . . including a conspiracy agreement to monopolize."). Accordingly, a complaint "must contain sufficient factual matter, taken as true, to plausibly suggest that an illegal agreement was made." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 46 (9th Cir. 2022). This evidence may be shown by direct or circumstantial evidence. *See Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822 (9th Cir. 2023). Absent ***direct*** evidence of an agreement, plaintiffs must allege "something more" than mere parallel action. *See In re DRAM*, 28 F.4th at 45. "[A]llegations of parallel conduct . . . could just as well be independent action," *Twombly*, 550 U.S. at 55-57, and "'allegations of facts that could just as easily suggest rational, legal business

---

[9] To prove a conspiracy to monopolize, a plaintiff must show (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury. *See Paladin Assoc., Inc. v. Montana Power Co*., 328 F.3d 1145, 1158 (9th Cir. 2003).

behavior by the defendants as they could suggest an illegal conspiracy' are insufficient to plead a § 1 violation." *In re Musical Instr.*, 798 F.3d at 1194 (quoting *Kendall v. Visa USA, Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008)).

The "something more" required for a Section 1 claim to survive a motion to dismiss are "plus factors" that "elevate allegations of parallel conduct to plausibly suggest the existence of a conspiracy." *See In re DRAM*, 28 F.4th at 47; *see also Arcell*, 2023 WL 5336865, at *4 (relying on plus factors analyzed in dismissing group boycott claim). A complaint must allege nonconclusory, "evidentiary facts: 'who, did what, to whom (or with whom), where, and when.'" *In re Musical Instr.*, 798 F.3d at 1194 n.6 (citation omitted). Although a plaintiff must often rely on "circumstantial evidence of parallel conduct and plus factors to sustain a case past the pleading stage[,] . . . a single plausible plus factor allegation that weakly tips in the plaintiffs' favor, without some further factual support, is not enough . . . ." *See In re DRAM*, 28 F.4th at 53. Where defendants' actions are "more likely explained by lawful, unchoreographed free-market behavior[,]" no plausible antitrust claim exists. *Id.* at 54 (quoting *Iqbal*, 556 U.S. at 680).

Here, Plaintiffs have failed to plausibly allege either an explicit agreement between the MLS Defendants (or all Defendants in Count IV) or any "plus factors" sufficient to survive a motion to dismiss. In fact, Plaintiffs concede at the outset that they cannot (and do not) allege the necessary evidentiary facts (who, what, when, where). *See In re Musical Instr.*, 798 F.3d at 1194 n.6. That is because the conspiracy allegations all are made "on information and belief." (Compl. ¶ 10 n.2). They insist that these allegations are "supported by publicly available facts" but, as explained below, ***none*** of these allegations (whether speculative or publicly available) plausibly identify an agreement. (*Id.*).

The Complaint fails to plausibly link alleged activities to any specific agreements concerning ShowingTime—including regarding either MLS Defendant's decision to terminate its ShowingTime contract. Instead, Plaintiffs lob general allegations of lawful and often parallel business activity, such as the MLS Defendants' CEOs having an "opportunity" to "communicate regularly" and engage in "general collaboration." (*Id.*

¶ 122); *see Kendall*, 518 F.3d at 1049 (rejecting plus factor based on proprietary interest in venture and participation on its board of directors). Indeed, while "***[a]typical*** communications between alleged coconspirators can constitute a plus factor," this is only the cases where "such communications . . . go beyond the 'standard fare' of business and trade-association practice." *Honey Bum*, 63 F.4th at 823 (emphasis added) (citation omitted). Even the more specific allegations of an agreement remain conclusory, including the fact-free assertions that MLS Aligned does not observe corporate formalities or that "Defendants coordinated on the launch of Aligned Showings and the removal of integration for ShowingTime" and that they "have agreed to funnel all showing management business conducted through each of their respective MLS member portals to their preferred vendor, Aligned Showings . . . ." (*Id.* ¶¶ 122–23). None of these allegations connect the dots with the particularity required by *Twombly* and *Musical Instruments*. At best, they present a disjointed and loosely parallel timeline. (*See id.* ¶¶ 65–69 (describing varying periods for each of the MLS Defendants' terminations and switches to Aligned Showings)).

Plaintiffs hope that the MLS Defendants' involvement in MLS Aligned carries enough overlap to demonstrate common motive, but even "common motive does not suggest an agreement." *See In re Musical Instr.*, 798 F.3d at 1194. Where parallel acts from competitors—and the MLS Defendants are not even alleged to compete with each other, with MLS Aligned, or with Plaintiffs—can be equally explained by unilateral economic interests, there can be no inference of an agreement to conspire. *See id.* In fact, the Ninth Circuit repeatedly rejects "common motive" as a sufficient "plus factor." *See Moore v. Mars Petcare US, Inc.*, 820 F. App'x 573, 575 (9th Cir. 2020) ("[W]e have rejected common motive as a plus factor to show an agreement"); *Prosterman v. Am. Airlines, Inc.* 747 F. App'x 458, 461 (9th Cir. 2018) ("[A]llegations of a 'common motive' are insufficient to state a claim."). Moreover, the MLS Defendants' financial interest in MLS Aligned's success "could just as easily suggest [a] rational" basis for their respective decisions to switch to Aligned Showings. *In re Musical Instr.*, 798 F.3d at 1194 (citation omitted). Relying on this association also would ignore the existence of four other MLSs with an

interest in MLS Aligned that are neither named as defendants nor alleged to have illegally conspired with the (named) Defendants to boycott ShowingTime. (Compl. ¶ 19). Plaintiffs also mistakenly rely on "common talking points and messaging" in explaining the MLS Defendants' anticipated departures from ShowingTime. (*See id.*, ¶¶ 107-19, 123). But "public statements" about "observations, predictions, and strategies for the future" are typically not considered plus factors, *DRAM*, 28 F.4th at 50, and only support a conspiracy when they could be construed as "invitations to agree", which is not alleged here. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F.Supp.2d 1109, 1116 (N.D. Cal. 2008).

The remaining "plus factor" allegation is the MLS Defendants' refusal to use ShowingTime's base calendaring software for free, which supposedly demonstrates that the MLS Defendants are not acting in their economic self-interest. It is true that an "extreme action against self-interest" can potentially be a "plus factor", but this is only so in such circumstances where the alleged action against self-interest is "perilous" and there exists no independent business reason for the defendant to have taken the action in question other than to engage in illegal conduct. *See In re Musical Instr.*, 798 F.3d at 1195. But the formation of MLS Aligned is sufficient to negate any adverse inference, as it is obvious that the MLS Defendants have a financial interest in the success of that joint venture. Moreover, as explained below (with respect to Count II), the Complaint identifies other legitimate business reasons explaining the decisions to terminate the ShowingTime contracts and switch to Aligned Showings. (*See infra* § IV.B.2.). Accordingly, the Complaint lacks sufficient and plausible allegations of an agreement and Counts I and IV must be dismissed.

### b. Plaintiffs Do Not (and Cannot) Plead an *Illegal* Boycott (Count I).

Even if the Complaint plausibly alleges an "agreement" to boycott ShowingTime and monopolize the showing management services market (it does not), it must further allege that the agreement is illegal (anticompetitive). *See Ohio v. Am. Express Co.*, 585 U.S. 529, 540–41 (2018) (an "illegal" agreement is one that ***unreasonably*** restrains trade). "The classic 'group boycott' is a concerted attempt by a group of competitors at one level to

protect themselves from competition from non-group members who seek to compete at that level." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 324, 834 (9th Cir. 2022) (quoting *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C. Cir. 1978)). It can be pled either as a *per se* violation or instead subject to the heightened rule of reason. The latter is the "default standard" in analyzing Section 1 claims, *Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011), while the *per se* rule is the rare exception that allows a presumption of unreasonableness without requiring proof that competition was harmed within a particular market. *See Ariz. v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 343–44 (1982).

An alleged group boycott *may* constitute a *per se* violation when "*competitors* enter into a horizontal agreement to boycott a firm *and* the boycott's initiator had no purpose other than disadvantaging the target—i.e., 'naked' group boycotts." *Honey Bum*, 63 F.4th at 820 (emphasis added). A boycott, however, only reaches *per se* illegality when it "disadvantages competitors." *APS*, 141 F.3d at 950 (quoting *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)). Here, Plaintiffs cannot plausibly allege *per se* liability because the MLS Defendants are not competitors. They do not compete in the market for showing management services, and neither is alleged to be a producer or supplier of any such service. (Compl. ¶¶ 17–18, 29, 48). Rather, each is a buyer of those services—as made clear by Plaintiffs' case being premised on their decisions to terminate ShowingTime and instead individually contract with MLS Aligned for Aligned Showings. (*Id.* ¶¶ 47, 67–68). Nor do they compete as MLSs since they operate nearly 2,000 miles apart and service entirely distinct regions. (*Id.* ¶ 93).

Moreover, should Plaintiffs point to the MLS Defendants' ownership of MLS Aligned (which does compete with Showing Time in the market for showing management services), the nature of their involvement in that market—partners with identical interests—precludes the possibility that they *compete*. (*Id.* ¶¶ 19, 56-59). *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984). Of course, the MLS Defendants are not competitors, but the point is the same—the conduct of MLS Aligned is undertaken jointly on behalf of its owners, so its unilateral conduct and the MLS Defendants'

1  involvement in that venture is a dead end for Plaintiffs.

2      The Complaint also fails to plausibly allege a rule of reason violation. "Under the

3  rule of reason, to decide whether a challenged restraint is unreasonable under the Sherman

4  Act, '[t]he focus is on [the] actual effects that the challenged restraint has had on

5  competition in a relevant market.'" *APS*, 141 F.3d at 950 (quoting *Bhan v. NME Hosps.,*

6  *Inc*., 929 F.2d 1404, 1410 (9th Cir. 1991)). First, a plaintiff must "accurately define the

7  relevant market, which refers to 'the area of effective competition.'" *FTC v. Qualcomm*

8  *Inc*., 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Am. Express*, 585 U.S. at 543). Even with

9  a proper market, the complaint also must allege an injury to competition—specifically, "a

10 reduction, rather than an increase, in competition resulting from the restraint." *Theee Movies*

11 *of Tarzana v. Pac. Theatres, Inc.*, 828 F.2d 1395, 1400 (9th Cir. 1987).

12     Here, the alleged relevant geographic markets are implausible on their face as the

13 boundaries are conveniently drawn to coincide with the precise service areas (in Milwaukee

14 and Phoenix) in which the MLS Defendants operate. Such market definitions are contrary

15 to law and scholarship: "[A] geographic market cannot be drawn simply to coincide with

16 the market area of a specific company." *Bailey*, 284 F.3d at 1249; *see also Morgan, Strand,*

17 *Wheeler & Biggs v. Radiology Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991) ("geographic

18 market is an area of effective competition . . . where buyers can turn for alternate sources

19 of supply." (cleaned up)); *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1581 (11th

20 Cir. 1985) ("The relevant market is the 'area of effective competition' in which competitors

21 generally are willing to compete for the consumer potential, and not the market area of a

22 single company.") (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-29

23 (1961)). The Complaint itself demonstrates that competition to provide showing

24 management services takes place nationally. (Compl. ¶ 34).

25     Second, even if a plausible relevant market is alleged, the Complaint must contain

26 allegations that, if true, would demonstrate that the challenged conduct would have "a

27 substantial anticompetitive effect that harms consumers in the relevant market." *Am.*

28 *Express*, 138 S. Ct. at 2284. Plaintiffs' failure to plead injury to competition is covered at

length in the MLS Defendants' argument above on Plaintiffs' lack of antitrust injury (*supra* § IV.A.1.) and argument below on Plaintiffs' failure to allege predatory or anticompetitive conduct in support of their attempted monopolization claim in Count II (*infra* § IV.B.2.), both of which the MLS Defendants incorporate herein by reference.

### 2.   Plaintiffs Fail to Allege an Attempted Monopolization (Count II).

Count II purports to plead an attempted monopolization by the MLS Defendants in violation of Section 2 of the Sherman Act. Plaintiffs must plausibly allege that the MLS Defendants (1) "engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). The lynchpin to this theory is that the MLS Defendants illegally refused—collectively or unilaterally—to deal with ShowingTime to maintain an integrated ShowingTime button to their MLS portals. Plaintiffs point to the MLS Defendants' refusal to even maintain ShowingTime's integrated button for free, thereby alleging that the "only conceivable reason" they would "forsake the short-term benefits" of the "free" offer was "to implement their scheme to shut ShowingTime out from competing entirely." (Compl. ¶ 164). Yet Plaintiffs' conclusory allegations ignore the many legitimate business justifications for the MLS Defendants that are also present in the Complaint, thereby failing to plead facts sufficient to satisfy the opening element in Count II—predatory or anticompetitive conduct—and requiring its dismissal.

Claims of anticompetitive conduct premised on a refusal to deal are extraordinarily difficult to plead and later prove since a business is "free to choose the parties with whom [it] will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc*., 555 U.S. 438, 448 (2009). Thus, a refusal to deal is not, on its own, a violation of the Sherman Act. Rather, a party may not "refus[e] to deal in order to create or maintain a monopoly absent a legitimate business justification." *Image Tech. Servs., Inc. v. Eastman Kodak Co*., 125 F.3d 1195, 1209 (9th Cir. 1997). Terminating an existing relationship may only violate the Sherman Act if "'the **only** conceivable rationale or purpose' of the termination 'is to sacrifice short-term benefits in order to obtain higher

profits in the long run from the exclusion of competition.'" *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (emphasis added) (quoting *MetroNet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1132 (9th Cir. 2004)). If a single "valid business reason" exists for a refusal to deal with another firm, then there has been no Sherman Act violation. *See Aspen Skiing*, 472 U.S. at 605. Even where there is mixed motive—including a desire to harm a competitor—no antitrust violation exists if the decision is based on at least one legitimate business reason. *See Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 2023 WL 6811871, at *17 (D. Or. Oct. 13, 2023) (granting motion to dismiss for failing to allege antitrust connection and facts otherwise alleged "could just as easily suggest a logical legitimate business reason").

Here, the Court need look no further than the Complaint itself for the many "valid business reasons" the MLS Defendants had for terminating their respective contracts with ShowingTime and replacing it with Aligned Showings. A primary business reason is Zillow's 2021 acquisition of ShowingTime. (Compl. ¶ 3). This acquisition transformed ShowingTime from being just another vendor with whom the MLS Defendants contracted into a vendor ***owned by an MLS participant***, creating a "conflict of interest" between an MLS and its membership. (*Id.* ¶¶ 107, 117). It also meant the MLS Defendants would need to transition from ShowingTime because of policies forbidding them to elevate the business of one member over another. (*Id.* ¶ 117 (describing Metro's policy barring it from "purchas[ing] products owned or managed by another MLS participant"); *id.* ¶ 108 n.25 (citing My Home Group, My ARMLS Training - Aligned Showings, YouTube, https://www.youtube.com/watch?v=Hmc50ySrhQI at 1:07, 12:26 (ARMLS representative explaining exit from ShowingTime because it "is owned by a competing brokerage," thereby creating "an unfair advantage" of "favoring [a] specific brokerage" and requiring ARMLS to "even [the] playing field")).[10]

---

[10] Plaintiffs allege that the policy does not actually exist or that its enforcement was pretextual. (Compl. ¶ 117). But Plaintiffs' conclusory statements are entirely undermined by the Complaint's other allegations, so the Court should disregard them. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555.

The Complaint is replete with additional evidence of the MLS Defendants' legitimate business justifications, nearly all of which center on a desire for a scheduling management service built exclusively for MLSs based on what they believe their members most want. For instance, the MLS Defendants have an obvious financial interest in the success of the MLS Aligned joint venture, so choosing to replace an integrated ShowingTime button with Aligned Showings makes business sense. Moreover, the Complaint acknowledges that MLSs "play competing vendors against each other" (Compl. ¶ 48), and in that vein, the MLS Defendants could have resolved the policy conflict created by Zillow's acquisition of ShowingTime by moving to one of the *five other* scheduling options that already were available. But they desired to better tailor a showing management tool to an MLS's specific needs. (*Id.* ¶ 58 n.11 (citing ARMLS + MLS Aligned Acquires Agent Inbox, ARMLS, https://armls.com/armls-mls-aligned-acquires-agent-inbox (press release explaining desire "to show the MLS industry that MLSs can innovate together and bring the products our members are asking for to life.")). By moving to Aligned Showings, the MLS Defendants could "provide members with a quality product that [they] control moving forward. Owning [their] showing service eliminates future acquisition anxiety and allows [them] to meet the needs of [their] members in the best way possible." (*Id.*).[11]

Plaintiffs lament the MLS Defendants for changing to Aligned Showings even after ShowingTime "offered to maintain the ShowingTime base calendaring software for free to members of those MLSs, and to integrate ShowingTime with Aligned Showings so that the

---

[11] Several more justifications are referenced in the Complaint. (*See, e.g.,* Compl. ¶ 61 n.13 (citing Aligned Showings, ARMLS, https://armls.com/aligned-showings (ARMLS describing as Aligned Showings as "offer[ing] a contemporary showing experience shaped by our valued subscribers.")); *id.* (citing Aligned Showings, Metro, https://metromls.com/aligned-showings/ (Metro describing Aligned Showings as "a modern, easy-to-use scheduling platform designed to meet the needs of the real estate industry, allowing agents to deliver exceptional service to their clients.")). ARMLS's CEO explained that "'[b]ringing Aligned Showings to our market is not just about adopting the latest technology, but is critical to architecting the future of MLS for the brokers and agents we serve.' The new service allows for interactivity between the listing agent, showing agent, and the homeowner, and it simplifies the calendaring of appointments and routing." (ARMLS Launches Aligned Showings to 40,000 Subscribers, ACCESSWIRE, https://www.accesswire.com/783261/armls-launches-aligned-showings-to-40000-subscribers) (cited at Compl. ¶ 63 n.14)).

two platforms can communicate, so long as the MLS member portals continued integration with ShowingTime (alongside Aligned Showings)." (Compl. ¶ 73). Yet ShowingTime has the roles reversed given both its and Zillow's dominance in their respective markets. (*See, e.g., id.* ¶ 34 ("ShowingTime products are used in hundreds of MLSs across the country.")). The Complaint reveals Plaintiffs' true intentions when contending ShowingTime's replacement will give Aligned Showings "a monopoly over showing management platforms in their respective regions". (*Id.* ¶ 11). ShowingTime itself previously enjoyed that status by virtue of being the only integrated service on the MLS portals in Phoenix and Milwaukee. (*Id.* ¶ 60). Plaintiffs' illogical framing means that ***any*** firm in that situation (whether ShowingTime or one of the other five competitors) would be a "monopolist"—a position that is inconsistent with basic principles of antitrust law.[12] In any event, the ultimate irony is that Plaintiffs premise this claim on their own (suspect) offering of ShowingTime's "base" service for free—a transparent attempt to drive a new competitor (MLS Aligned) out of business. *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co*., 549 U.S. 312, 318 (2007) (describing "typical predatory-pricing scheme" as first involving a monopolist "reduc[ing] the sale price of its product (its output) to below cost, hoping to drive competitors out of business"). More likely is that Plaintiffs conveyed this "free" offer in attempt to bring this case within the *Aspen Skiing* fact pattern. (Compl. ¶ 165).

In *Aspen Skiing*, the Supreme Court recognized a very limited exception to the freedom to deal principle. There, the defendant owned three major Aspen ski resorts and was found to have violated Section 2 for refusing to sell to the fourth and final major resort owner after effectively terminating an agreement to sell an interchangeable, multi-day lift ticket without any legitimate business reason. 472 U.S. at 592. Defendant proposed lowering the fourth resort's cut of the ticket revenue to an amount the fourth resort "could not accept", and then refused to accept an alternative proposal based on skier usage and involving the fourth resort purchasing advanced tickets from defendant. *Id.* Cutting out the

---

[12] This framing also further demonstrates why Plaintiffs' geographic market definition makes no sense.

fourth resort meant meaningful revenue losses for defendant, who elected to incur the losses "because it was more interested in reducing competition in the Aspen market over the long run by harming its smaller competitor." *Id.* at 608. Yet if valid business reasons exist for the decision—even if reasons adverse to plaintiff also existed—no Section 2 violation could exist. *Id.* at 605. The Court considered those purported reasons and possible efficiencies alleged to exist from the conduct, since "attempting to exclude rivals on some basis other than efficiency" may be characterized as "predatory." *Id.* at 606. But the stated justifications for the conduct were easily disproved, and the Supreme Court agreed that the record "comfortably support[ed] an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival." *Id.* at 610. This case is nothing like *Aspen Skiing* given the breadth of business justifications present in the Complaint and the inverted roles, with the MLS Defendants declining to ***purchase*** ShowingTime's services, as opposed to refusing to ***sell*** ShowingTime anything.

Finally, Plaintiffs' theory—and corresponding request for injunctive relief—would improperly foist upon the Court the role of "central planner" in the showing management services market and possibly mandate an open access regime. In essence, Plaintiffs are asking the Court to order each MLS Defendant—and necessarily ***every MLS around the country*** based on their theory—to do business with ShowingTime, regardless of legitimate justifications either MLS Defendant (or any other MLS) has for declining to do so. It would also require the Court to address, among other things, how much ShowingTime could charge (if anything), how long these relationships must continue, and whether Aligned Showing could also be an integrated service alongside ShowingTime. Even worse, Plaintiffs may be asking the Court to restructure the MLS Defendants' businesses (and the entire industry) by requiring them to make integration available to all showing management vendors, effectively eliminating competition, rather than promoting it. Having a court "act as central planner[], identifying the proper price, quantity, and other terms of dealing—[is] a role for which [courts] are ill suited." *Verizon*, 540 U.S. at 408. "[J]udges make for poor 'central planners' and should never aspire to that role." *Nat'l. Collegiate Ath. Ass'n v.*

*Alston*, 141 S. Ct. 2141, 2163–64 (2021); *see also Aerotec*, 836 F.3d at 1184 (same).

### 3.      Plaintiffs Fail to State an Essential Facilities Claim (Count III).

Count III purports to state a claim under Section 2 of the Sherman Act for denial of access to an essential facility—the MLS member portals operated by ARMLS and Metro. Plaintiffs allege that ShowingTime "cannot compete in the relevant geographic markets without ***integration*** into the ARMLS and Metro MLS member portals."[13] (Compl. ¶¶ 168–69 (emphasis added)). By "terminating" their contracts with ShowingTime—making ShowingTime no longer fully integrated on those portals (*id.* ¶¶ 65, 118)—the MLS Defendants allegedly unlawfully denied access to this essential facility.[14] (*Id.* ¶¶ 168–72).

The Ninth Circuit describes the essential facility doctrine as a "variation" on a refusal to deal; however, a viable claim is extremely rare in this Circuit, and the Supreme Court has never formally recognized it. *See Aerotec*, 836 F.3d at 1184–85; *Verizon*, 540 U.S. at 411 ("[W]e have never recognized such a doctrine . . . ."). In theory, liability arises "where ***competitors*** are denied access to an input that is deemed essential, or critical, to competition." *Aerotec*, 836 F.3d at 1184 (emphasis added). To plead a violation, ShowingTime must plausibly allege that (1) each MLS Defendant is a monopolist in control of an essential facility (the MLS portal), (2) competitors of the monopolist(s) are unable to duplicate the MLS portals for their purposes, (3) MLS Defendants have refused to provide the competitors access to the MLS portals, and (4) it is feasible for the MLS Defendants to do so. *See Ferguson v. Greater Pocatello Chamber of Commerce, Inc.*, 848 F.2d 976, 983 (9th Cir. 1988). Plaintiffs fail to establish several of these elements.

<u>First</u>, the MLS Defendants are not ShowingTime's "competitors." Rather, they are ***consumers*** of showing management services, which is the product market in which ShowingTime competes. (*See* Compl. ¶ 16 ("ShowingTime offers showing management

---

[13] Count III addresses access to both "integration" into the ARMLS and Metro portals (Compl. ¶ 169) and the underlying MLS listings data (*id.* ¶ 170). Plaintiffs' access to the MLS listings data, however, is not in question. Plaintiffs concede that ARMLS has entered into a new license agreement with ShowingTime "enabling ShowingTime to continue to receive a feed of ***all ARMLS listings data***." (*Id.* ¶ 65 n.15 (emphasis added)).

[14] The Complaint does not allege that the MLS Defendants have denied ***Zillow*** "access" to anything. (Compl. ¶¶ 168–71). Thus, ShowingTime is the only plausible plaintiff.

services and software for the real estate industry"); *id.* ¶ 29 ("[M]any MLSs contract with third-party vendors to provide services to their members such as . . . showing management platforms"); *id.* ¶ 48 ("MLSs typically contract with showing management platforms for systemwide distribution on the MLS member portal.")). This fact alone is dispositive of the claim. *See Ferguson*, 848 F.2d at 983 (affirming grant of summary judgment where plaintiff was "not in competition with" alleged monopolist in control of essential facility).

Second, Plaintiffs cannot plausibly allege that the MLS member portals are "essential" because control of that portal does not give the MLS power to ***eliminate*** competition in the downstream market—*i.e.*, the market for showing management services. "A facility that is controlled by a single firm will be considered 'essential' only if control of the facility carries with it the power to *eliminate* competition in the downstream market." *Alaska Airlines, Inc. v. United Airlines, Inc*., 948 F.2d 536, 544 (9th Cir. 1991). Here, the downstream market is showing management services, which Plaintiffs describe as "ancillary" to the operation of an MLS portal. (Compl. ¶¶ 6, 29, 47, 86). But Plaintiffs' cannot plausibly allege that competition in that downstream market has been eliminated. To begin with, Plaintiffs admit that, in addition to ShowingTime and Aligned Showings, "[m]any other companies provide showing management services[.]" (*Id.* ¶ 33 (identifying five such vendors)). Like ShowingTime, none of these other providers are integrated into the ARMLS portal. (*Id.* ¶ 64 (alleging that Aligned Showings will become the only fully integrated option in the ARMLS portal)). Yet, there is no suggestion in the Complaint that any of these providers have been foreclosed from competing to offer showing management services in the ARMLS region or anywhere else. The existence of a robustly competitive market renders implausible an inference that the MLS Defendants have the ability to eliminate competition in the downstream market for showing management services.

Moreover, Plaintiffs admit that, in the year prior to the expiration of the ARMLS license with ShowingTime, almost 20% (1 in 5) of tours scheduled in the ARMLS region ***through ShowingTime*** were nevertheless ***not*** made by using that integrated button on the ARMLS portal. (*Id.* ¶ 50). In other words, the power to control which showing management

platform is integrated on an MLS portal does ***not*** confer on the MLS the power to ***eliminate*** competition in the market for showing management services in the MLS's region. Even if Aligned Showings—or a competitor—replaces ShowingTime as the lone, integrated option on the MLS portal, a broker still may schedule a tour using a competitive service. (*Id.* ¶¶ 51–54). As a matter of law, a facility is not "essential" under these circumstances.

Finally, the Ninth Circuit has explained that a "facility is only 'essential' where it is otherwise ***unavailable***." *Aerotec*, 836 F.3d at 1185 (emphasis added); *see also MetroNet Servs. Corp.*, 383 F.3d at 1129–30. Plaintiffs admit that ShowingTime will continue to have access to the MLS portals—just not in the manner that Plaintiffs desire with respect to ideal convenience and efficiency. (Compl. ¶¶ 49–54).[15] A plaintiff that still has "reasonable access" to the facility cannot sustain an essential facilities claim, even if that access is not "conducive" to the plaintiff's "existing business model." *MetroNet*, 383 F.3d at 1130. As the Ninth Circuit has explained, "The doctrine does not guarantee competitors access to the essential facility in the most profitable manner." *Id.* Indeed, the Ninth Circuit rejected an essential facilities claim where the plaintiff was forced to endure a "Kafkaesque" ordering process to access the facility in question. *Aerotec*, 836 F.3d at 1185. Even in an age of rapid technological advances, Plaintiffs cannot seriously contend that having to "manually type showing instructions" into an MLS listing (Compl. ¶ 52) or "open a new browser window" to cut and paste the URL (*id.* ¶ 53) rise to the level of "Kafkaesque" (if that were even enough). In sum, Plaintiffs simply cannot establish this "indispensable" requirement. *Verizon,* 540 U.S. at 411 ("[W]here access exists, the doctrine serves no purpose.").

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed with prejudice.

---

[15] The allegation that an unintegrated showing management platform is "functionally unworkable for most agents" (Compl. ¶ 55) cannot save this claim. The immediately preceding allegations demonstrate that an unintegrated showing management platform is ***not*** "unworkable" (either "functionally" or otherwise) (*id.* ¶¶ 51–54), and the fact that ***some*** agents can use such a platform negates any plausible inference that the facility is unavailable. (*See also id.* ¶ 50).

1  RESPECTFULLY SUBMITTED February 20, 2024

2  QUARLES & BRADY LLP
   One Renaissance Square
3  Two North Central Avenue
   Suite 600
4  Phoenix, AZ  85004-2322

5

6  By: */s/ Brian A. Howie*
   Edward A. Salanga
7  Brian A. Howie
   Benjamin C. Nielsen
8  Joseph P. Poehlmann

9  *Attorneys for Defendant Arizona Regional
   Multiple Listing Service, Inc. and Multiple
10 Listing Service, Inc.*

11

12 **CERTIFICATE OF CONFERRAL**

13     I hereby certify that on Ferbuary 14, 2024, I conferred with Plaintiffs' counsel

14 regarding the relief requested herein, and whether an amendment could cure what the MLS

15 Defendants believe to be deficiencies in Plaintiffs' Complaint. Despite our efforts, we have

16 been unable to agree that the Complaint is curable by a possible amendment. I declare under

17 the penalty of perjury that the foregoing is true and correct and that this certification was

18 executed on February 20, 2024.

19

20                        */s/Brian A. Howie*

21

22

23

24

25

26

27

28

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on Ferbuary 20, 2024, a true copy of the foregoing document was filed with the ECF system and will be electronically sent to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to any non-registered participants.

*/s/ Debra L. Hitchens*
*Employee of Quarles & Brady LLP*